UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

**FILED**

99 DEC 15 PM 4:41

U.S. DISTRICT COURT
N.D. OF ALABAMA

CAMPBELL & SONS OIL COMPANY, )
INC., THRASHER OIL COMPANY, )
INC., and TOMCO, INC., )
 )
    Plaintiffs, )
 )
vs. ) Civil Action No. CV-99-S-3176-NE
 )
MURPHY OIL USA, INC., )
 )
    Defendant. )

**ENTERED**

DEC 15 1999

### MEMORANDUM OPINION

This action is before the court on plaintiffs' motion for temporary restraining order. Upon consideration of the pleadings, evidence produced during a hearing held December 7 and 8, 1999, and the arguments and briefs of counsel, the court enters the following opinion.

### I. BACKGROUND

Plaintiffs are Alabama corporations that sell motor fuels at wholesale and retail within the State of Alabama. Campbell & Sons Oil Company, Inc. ("Campbell") owns and operates 28 retail gasoline stations in Madison County, Alabama. Twenty five of those stations are "branded," selling either Texaco or Conoco motor fuels, while the remainder are "unbranded" and sell petroleum products under the trade name of "Liberty 2000." One of Campbell's Conoco-branded stations is located on South Memorial Parkway in Huntsville,



Alabama, approximately one mile south of the defendant's station
that is discussed below.

Plaintiffs Thrasher Oil Company, Inc. ("Thrasher") and Tomco,
Inc. ("Tomco")[1] are related Alabama corporations, in that the same
persons own all shares of stock in both entities.  Both companies
sell only Shell petroleum products through approximately eighteen
convenience store gasoline stations in Madison County, Alabama.
Two such retail outlets are located on South Memorial Parkway in
Huntsville, Alabama, but the station upon which the testimony
focused is located adjacent to defendant's facility discussed
below.  The business relationships and interests associated with
that station are convoluted.  The real property, together with the
improvements constructed thereon, are owned by a third person; that
property is leased by Thrasher; and Tomco sells Shell motor fuel
that it purchases at wholesale from Thrasher to the public.  Even
though the President of Thrasher testified that the retail losses
sustained at that location are suffered equally by Thrasher and
Tomco, "because the control group is the same," this court is of
the opinion that Tomco is the proper party with standing to

---

[1] Tomco was added as a party by amendment to plaintiffs' complaint on
December 13, 1999 (Doc. No. 14).  Such an amendment was proper pursuant to Rule
15(a) of the Federal Rules of Civil Procedure, because defendant had not filed
an answer or any other responsive pleading.

2



complain of defendant's pricing practices, at least as to the Shell
station upon which the evidence has thus far focused.[2]

Defendant Murphy Oil USA, Inc. ("Murphy") is an Arkansas
corporation headquartered in El Dorado, Arkansas.  The company
allegedly is "a vertically integrated producer with worldwide
exploration and production activities, refining activities, and
wholesale and retail marketing operations" earning gross revenues

---

[2] State law guides the determination of standing in diversity cases.  See
Beckman Cotton Company v. First National Bank of Atlanta, 666 F.2d 181, 183 (11th
Cir. 1982).  Generally, under the law of Alabama a plaintiff establishes standing
to sue by "alleg[ing] an injury directly arising from or connected with the wrong
alleged ...."  Ex parte Blue Cross & Blue Shield of Alabama, 582 So. 2d 469, 474
(Ala. 1991).  When a statute prohibits certain conduct and delineates the persons
entitled to seek redress for such conduct, the text of that statute determines
standing.

In Russell v. Birmingham Oxygen Service, Inc., 408 So. 2d 90 (Ala. 1981),
the Supreme Court of Alabama refused to permit a wholly-owned subsidiary to
enforce a non-compete agreement entered into by the subsidiary's parent
corporation and a third party, absent evidence of intent to create an assignment.
Even though one stockholder owned both the parent and the subsidiary, the Russell
court found that the subsidiary lacked standing:

> Appellees argue that it makes no difference whether Birmingham
> Oxygen [the parent] or Southeastern Medical [the subsidiary]
> enforces the non-competition agreement, since Barney C. Eller wholly
> owns both corporations and it was him with whom Edwardo and Russell
> dealt.  This contention is without merit.  A corporation is an
> entity created by compliance with statutory requirements.  A
> corporation has the right to sue and be sued just like a natural
> person. ... a corporation, just like an individual, must enforce its
> own rights and privileges.

Id. at 93 (emphasis supplied).  The decision in Russell indicates that Tomco
"must enforce its own rights and privileges." Among these rights is the ability
to sue a fellow retailer, like Murphy Oil USA, Inc., for sale of fuel below cost,
"where the effect is to injure competition." Ala. Code § 8-22-6.  "Competition"
in the Alabama Motor Fuels Marketing Act encompasses "any person who competes
with another person in the same market area at the same level of distribution."
Id. § 8-22-4(13) (emphasis supplied).  This indicates that Thrasher, as a
wholesaler of the gasoline sold by Tomco at the Shell station located adjacent
to defendant's facility, lacks standing to sue Murphy Oil USA, Inc., for
injurious competition at the retail level.

in 1998 of "almost $2 billion." (Complaint ¶ 2.) Murphy opened a retail gasoline outlet on the property of a Wal-Mart "SuperCenter" situated on South Memorial Parkway in Huntsville, Alabama, on July 31, 1999. Even though it would be inappropriate to modify the word "station" with the adjective "service" when describing Murphy's facility, because it consists of only four pumps monitored by an attendant housed in a small kiosk, the retail outlet, nevertheless, has been remarkably successful in attracting consumers. It surpassed Murphy's "target projection" of 175,000 gallons a month in just three months, selling 130,000 gallons in August, 135,000 gallons in September, 176,000 gallons in October, and 216,000 gallons in November of 1999.[3]

In response to such sales volumes, plaintiffs filed this action on November 30, 1999.[4] They allege that Murphy is selling

_____

[3] These sales volumes are especially remarkable in view of the fact that, unlike Campbell's nearest Conoco station and Tomco's Shell station next door, the Murphy station does not front on South Memorial Parkway. Even so, the facility is clearly visible from that roadway, and it can be readily accessed from the Parkway through either the Wal-Mart parking lot (which does front on the Parkway) or via a side street intersecting the Parkway.

[4] The action originally was filed in the Circuit Court for Madison County, Alabama, but removed to this court by defendant on December 1, 1999, pursuant to 28 U.S.C. §§ 1332, 1441, 1446. Plaintiffs moved to remand (Doc. No. 5), asserting this court lacked subject matter jurisdiction because the amount in controversy did not exceed the $75,000. The court received evidence on that issue on December 7, 1999, and determined that the value to plaintiffs of the rights sought to be enforced by injunction was greater than the jurisdictional threshold. See, e.g., Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 347, 97 S.Ct. 2434, 2443, 53 L.Ed.2d 383 (1977) ("In actions seeking declaratory or injunctive relief, ... the amount in controversy is measured by the value of the object of the litigation."); Ericsson GE Mobile Communications

4

motor fuel "below cost" in violation of the Alabama Motor Fuel Marketing Act of 1984 ("AMFMA" or "the Act"), Alabama Code §§ 8-22-1 through 8-22-17 (1975), and seek injunctive relief.

## II. DISCUSSION

### A.    Standards for Entry of a Temporary Restraining Order

To justify the entry of a temporary restraining order or preliminary injunction, plaintiffs must satisfy four prerequisites: (1) demonstrate a substantial likelihood of ultimately prevailing on the merits; (2) show they will suffer irreparable harm if an injunction maintaining the status quo pendente lite does not issue; (3) prove that the threatened injury to plaintiffs outweighs whatever damage the proposed injunction may cause the opposing party; and (4) demonstrate that the injunction will not be adverse to the public interest. E.g., McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998); Northeastern Florida Chapter of the Association of General Contractors of America v. City of Jacksonville, Florida, 896 F.2d 1283, 1284 (11th Cir. 1990). See generally 11A Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2948, at 131-33 (2d ed. 1995). Each of these factors is discussed in the following sections.

---

v. Motorola Communications & Electronics, Inc., 120 F.3d 216, 218 (11th Cir. 1997).

1.   Likelihood of Success on the Merits

The requirement that a movant demonstrate a substantial likelihood of ultimately prevailing on the merits does not mean that the movant must actually succeed on the merits. *See Johnson v. United States Department of Agriculture*, 734 F.2d 774, 782 (11th Cir. 1984). The movant simply must show a "likelihood" of success, because of the underlying rationale of both temporary restraining orders and preliminary injunctions:

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.  Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.  A party thus is not required to prove his case in full at a preliminary-injunction hearing, ... and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.

*University of Texas v. Camenisch*, 451 U.S. 390, 394, 101 S.Ct. 1830, 1833, 68 L.Ed.2d 175 (1981). Here, however, plaintiffs have, at an early stage, demonstrated a clear probability of success on the merits.

The Alabama Supreme Court has held that three sections of the AMFMA, sections 8-22-3, -6, and -9, must be construed together. *State ex rel. Galanos v. Mapco Petroleum, Inc.*, 519 So. 2d 1275,

6

1286 (Ala. 1987).[5] Section 3 contains a declaration of the legislature's intent, and it reads as follows:

> It is hereby declared that marketing of motor fuel in Alabama is affected with the public interest. It is hereby declared to be the legislative intent to encourage fair and honest competition, and to safeguard the public against creation of monopolies or unfair methods of competition, in transactions involving the sale of, or offer to sell, or inducement to sell motor fuel in the wholesale and retail trades in this state. It is further declared that the advertising, offering for sale, or sale of motor fuel below cost or at a cost lower than charged other persons on the same marketing level with the intent of injuring competitors or substantially lessening competition is an unfair and deceptive trade practice. The policy of the state is to promote the general welfare through the prohibition of such sales. The purpose of the Motor Fuel Marketing Act is to carry out that policy in the public interest, providing for exceptions under stated circumstances, providing for enforcement and providing penalties.

Ala. Code § 8-22-3 (1975). Section 6 prohibits certain "below cost fuel sales" in the following words:

> It shall be unlawful for any person engaged in commerce in this state to sell or offer to sell motor fuel below cost or to sell or offer to sell it at a price lower than the seller charges other persons on the same day and on the same level of distribution, within the same market area, where the effect is to injure competition.

Id. § 8-22-6. Finally, section 9 provides that:

---

[5] The Alabama Supreme Court so held, because the act of reading each section "literally and in isolation might well lead to a conclusion that they are unreasonably overbroad or void for vagueness...." State ex rel. Galanos v. Mapco Petroleum, Inc., 519 So. 2d 1275, 1286 (Ala. 1987).

It shall be unlawful under this section:
    (1) For any person engaged in commerce in this state to sell or offer to sell motor fuel at wholesale or retail, as the case may be, where the effect is to injure competition.
    (2) For any person, where the effect is to injure competition, to offer a rebate, to offer to give a rebate, to offer a concession of any kind in connection with the sale of motor fuel.
    (3) For any retailer to induce or attempt to induce or to procure or attempt to procure the purchase of motor fuel at a price less than cost to wholesaler. Any person who violates any provision of this section shall be subject to the provisions and penalties of this chapter.

Id. § 8-22-9.

The Act elsewhere defines the terms "sale or sell" as meaning "[a]ny transfer for a combination, exchange, barter, gift, offer for sale, advertising for sale, soliciting an order for motor fuel and distribution in any manner or by any means whatsoever." Id. § 8-22-4(7). Section 10 of the AMFMA expands that definition by providing that:

In all advertisements, offers for sale or sales involving two or more items, at least one of which items is motor fuel, at a combined price, and in all advertisements, offers of sale, or sales, involving the giving of any gift or concession of any kind whatsoever (whether it be coupons or otherwise), the wholesaler's or retailer's combined selling price shall not be below the cost to the wholesale or the cost to the retailer, respectively, of the total of all articles, products, commodities, gifts, and concessions included in such transactions, except that if any such articles, products, commodities, gifts, or concessions, shall not be motor fuel, the basic cost thereof shall be determined in like

8

manner as provided in subdivision (14) of Section 8-22-4.
*Id.* § 8-22-10.  Both sections fold back upon section 8-22-9(2), set
out above, which makes it unlawful for "any person"[6] to offer a
"rebate" or "concession of any kind in the sale of motor fuel" when
the "effect" of such practice "is to injure competition."

### a.  Elements of a prima facie case

Reading the foregoing sections *in pari materia*, the Alabama
Supreme Court declared that plaintiffs must show, first, that
defendant sold motor fuel below its costs and, second, that such
action had the effect of injuring competition.  *Galanos*, 519 So. 2d
at 1286 ("[T]he legislature has in explicit terms prohibited sales
below cost where the effect is to injure competition.").  It is not
required that plaintiffs prove defendant intended to injure
competition; rather, as Chief Justice Torbert observed in his
special concurrence to the *Galanos* decision, "such an intent will
be presumed upon a showing that the acts have the effect of
injuring competition.  The defendant can rebut that presumption by
proving [as an affirmative defense] the lack of [a harmful]
intent."  *Galanos*, 519 So. 2d at 1289 (Torbert, C.J., concurring).
Chief Justice Torbert's statement is but a gloss on the words of

---

[6] "Person" is defined expansively, and includes "[a]ny person, firm,
association, organization, partnership, business trust, joint stock company,
company, corporation, or legal entity."  Ala. Code § 8-22-4(1).

Justice Almon who, in speaking for the Court in *Galanos*, said:

> It may readily be seen [from reading sections 8-22-3, -6, and -9 *in pari materia*] that the legislature has in explicit terms prohibited only sales below cost where the effect is to injure competition. We think that to read the intent provision of § 8-22-3 into those provisions so as to place a burden on the [plaintiff] to prove intent would be manifestly contrary to the terms of the Act. However, we do think that the various provisions of the Act can be read together in a way that will save their constitutionality. It is quite consonant with the spirit and terms of the Act to construe it as providing that the [plaintiff] proves a prima facie case when it proves a sale below cost and an injurious effect on competition, and yet as allowing the defendant to prove lack of a harmful intent either in avoidance of liability or in mitigation of any penalty, as the trier of fact may determine.

*Galanos*, 519 So. 2d at 1286. Each element of liability and defense is discussed in the following subsections.

### i    Sales below cost

Plaintiffs demonstrated that defendant sold motor fuel below its costs from November 18 through 24, 1999. During that period, Murphy's "laid-in," or "basic cost" of regular (87 octane) unleaded gasoline was $1.1529 a gallon.[7] (See Plaintiffs' Exhibits 1 & 4.)

---

[7] The President of Thrasher Oil testified that the "laid-in cost" of motor fuel is calculated by adding federal, state, and local taxes, freight costs, and inspection fees to the "rack price": i.e., the amount paid for each gallon purchased at the Duncan Terminal near Birmingham, Alabama (see Plaintiffs' Exhibit 1: a copy of the Oil Price Information Service ("OPIS") listing for the period November 12-29, 1999). As thus defined, the "laid-in cost" is equivalent to the Act's definition of "basic cost of motor fuel" found at Ala. Code § 8-22-4(14):

(14) BASIC COST OF MOTOR FUEL. Whichever of the two following amounts is lower, namely, (i) the invoice cost of motor fuel to the

when Murphy's "cost of doing business or overhead expenses,"[8] which it asserts is only 6.8 cents a gallon, is added to its laid-in cost,[9] the total cost to Murphy for each gallon of regular unleaded gasoline pumped at its Huntsville retail outlet was $1.2209.

Yet, during the period in question — which significantly commenced on the same date that Tomco opened its new Shell-branded gasoline station and convenience store on South Memorial Parkway,

wholesaler or retailer, as the case may be, or (ii) the lowest replacement cost of motor fuel to the wholesaler or retailer, as the case may be, within five days prior to the date of sale, in the quantity last purchased (whether within or before the said five day period), less, in either of said two cases, all trade discounts except customary discounts for cash, plus the full value of freight costs and any taxes which may be required by law, now in effect or hereafter enacted, if not already included in the invoice cost of the motor fuel to the wholesaler or retailer, as the case may be In computing its basic cost of motor fuel, its cost of doing business and in meeting competition under Section 8-22-0; [sic] a refiner that assesses a processing fee of any kind for credit card transactions must access such fees in a like manner to its affiliates.

[8] See Ala. Code § 8-22-4(17), providing:

(17) COST OF DOING BUSINESS OR OVERHEAD EXPENSES. Includes all costs incurred in the conduct of business, including but not limited to: labor (including salaries of executives and officials), rent (which rent must be no less than fair market value based on current use), interest on borrowed capital, depreciation, selling cost, maintenance of equipment, transportation or freight cost, losses due to breakage or damage; credit card fees, or other charges; credit losses; all types of licenses, taxes, insurance, and advertising.

[9] See Ala. Code § 8-22-4(16), reading as follows:

(16) COST TO RETAILER. As applied to retail sales, the invoice or replacement cost of the motor fuel within five days prior to the date of sale, in the quantity last purchased, whichever is less, less all trade discounts except customary discounts for cash, to which shall be added all applicable state, federal and local taxes, inspection fees, freight cost, if paid by the retailer, plus the cost of doing business. [Emphasis added.]

11

immediately adjacent to Murphy's station — Murphy sold regular gas
to the general public for $1.049 a gallon.    If the consumer
presented a "Wal-Mart Gift Card" to the cashier, however, then that
price was discounted an additional three cents for each gallon
purchased, yielding a net price to the consumer of $1.019 a gallon.
In either event, Murphy was selling regular unleaded motor fuel to
the general public for 17.19 cents less (and to Wal-Mart Gift Card
holders for 20.19 cents less) than its costs.[10]

### ii    Injurious effect on competition

Plaintiffs also have demonstrated that such pricing practices
had an injurious effect on competition.

The Vice President of Campbell Oil Company testified that,
prior to the opening of defendant's Huntsville station, his
company's Conoco-branded station nearest Murphy's station sold
60,000 to 65,000 gallons of gasoline each month.    The volume for
each month since Murphy entered the market has been significantly
less: 40,000 gallons in the months of August and September; 29,000
gallons in October; and 41,000 gallons in November of 1999.
Moreover, the "mix" of grades sold has changed.    Before Murphy

---

[10] Even Murphy's own records, which this court does not presently find
entirely credible, demonstrate that it was selling regular unleaded gasoline for
7.95 cents less than its costs on November 18th, 5.53 cents less on November
19th, 8.53 cents less on November 22nd, and 1.20 cents less on November 23, 1999.
(See "Today's Margin" on each page of Defendant's Exhibit 7).

entered the market, Campbell's gross monthly sales volume was divided 50% regular unleaded, 25% mid-grade, and 25% premium grade gasoline.  In contrast, during the four months following the opening of Murphy's Huntsville station, Campbell's sales have been divided 75% regular unleaded, 15% mid-grade, and only 10% premium grade gasoline.  Campbell's losses have been so great that it considered closing the station, but opted to pursue this litigation as a means of avoiding that.

Although Tomco's retail losses are more difficult to quantify, due to the fact that its new station opened only a few weeks ago, the President of Thrasher Oil testified that sales have been significantly less than his market projections.

### iii  Lack of harmful intent

Defendant failed to rebut the presumption of an intent to injure competition arising upon plaintiffs' proof of a prima facie case.

As the Alabama Supreme Court has observed, the State Legislature "provided several exceptions [to the AMFMA] that may be characterized as [affirmative] defenses of 'no injurious intent.'" Galanos, 519 So. 2d at 1286.  The statutory exception asserted by Murphy during hearing was that of "meeting competition."

13

> It is not a violation of this chapter if any price
> is established in good faith to meet an equally low price
> of a competitor in the same market area on the same level
> of distribution selling the same or a similar product of
> like grade and quality or is exempt under Section 8-22-
> 10.

Ala. Code § 8-22-8(b); see also id. §§ 0-22-12, 8-22-13(a).

In support of that defense, Murphy's Vice President of
Regional Marketing testified that he personally determined the
price for each grade of motor fuel sold at the company's Huntsville
station in reliance upon comparative market price surveys compiled
Monday through Friday (and sometimes on a Saturday or Sunday) of
each week by the station manager. The surveys were transmitted
each morning by facsimile to Murphy's corporate headquarters in
Arkansas, where they were reviewed. Daily decisions about the
price to be charged for each grade of gasoline sold at the
Huntsville station for the remainder of that day, or beginning the
following morning, were handwritten on the bottom of the same faxed
survey form and re-transmitted by facsimile to the station manager.
(See Defendant's Exhibits 8 and 9.) This court rejects that
evidence for three independent reasons.

First, the court does not find Murphy's comparative market
price surveys for the period focused upon, November 18th through
the 24th, to be credible. Counsel for plaintiff demonstrated

14

several inconsistences between the information recorded in those forms and other evidence.   For example, the surveys list two competitors that allegedly sold regular unleaded gasoline as low as Murphy during the period in question: the "Mojo's" and "Williams Service" stations on South Parkway, both of which were recorded as selling that grade for $1.04 a gallon continuously from November 12th through the 23rd.   However, both "Mojo's" and "Williams Service" are owned or operated by the same company, Williams Petroleum Company, and the owner of that company testified that he did not lower his price for regular unleaded gasoline to $1.04 a gallon until November 19th, and then only in response to Murphy's posted price.   In doing so, Williams Petroleum Company also sold below its costs.

Second, Murphy's price surveys include a number of stations that this court determines to be outside "the same market area." Murphy's Huntsville manager allegedly surveys the prices posted by competitors located "on Memorial Parkway" three to four miles north, and five to six miles south, of defendant's station.   The southern log of that loop, however, carries the manager over the Tennessee River bridge, into Morgan County, Alabama.   Not only is that stretch of road no longer "Memorial Parkway" (rather, it then is U.S. Highway 231), but it enters an area that traditionally has

15

been referred to as "Gasoline Alley," because of the numerous branded and unbranded stations clustered there. The area is not located within the limits of any incorporated town or municipality, and Morgan County does not levy a gasoline tax. It follows, therefore, that each station in Gasoline Alley can sell any grade of motor fuel for four cents a gallon less than any dealer located in Huntsville (which levies a one cent per gallon tax) and Madison County, Alabama (which exacts a three cent per gallon tax). Even so, not one of such stations listed on Murphy's comparative market price surveys[11] sold regular unleaded gasoline for as little as $1.04 a gallon during the period this opinion has focused upon. Thus, even if such stations were deemed to be within "the same market area," and this court finds at this stage of the litigation that they are not,[12] they still provide no justification for Murphy's challenged pricing practices.

Finally, this court finds that Murphy knowingly lowered its price for regular unleaded gasoline to $1.04 a gallon for the

---

[11] "Gasoline Alley" comparators are identified on each sheet of Defendant's Exhibit 9 by the initials "GA."

[12] See Richard A. Posner, Economic Analysis of Law 282 (3d ed. 1986) (noting the tendency of courts when defining market areas "to include in the market those sellers who actually sell to the same group of customers and exclude those who do not"). Cf. United States v. Engelhard Corp., 126 F.3d 1302, 1305 (11th Cir. 1997) ("The boundaries of the product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product and substitutes for it.").

general public (and to $1.01 a gallon for holders of Wal-Mart Gift
Cards) on the eve or morning of the opening of Tomco's Shell
station, and that it did so with the intent of solidifying its
competitive position in relation to that station, offering far more
pumps and amenities in its "convenience store" than Murphy's simple
four pump "kiosk." *See Galanos*, 519 So. 2d at 1286 (discussing the
"destructive practice of developing clientele and diminishing
competitors' business while temporarily suffering a loss in
anticipation of higher profits after competitors have been driven
out of business"). As a consequence, Murphy cannot claim the
benefits of the "meeting competition" affirmative defense.

> We do not agree with the defendant's interpretation
> that meeting competition means beating competition.
> Section 8-22-8 is clear and unambiguous. The statute
> cannot be read so as to allow one defendant-competitor to
> undercut another plaintiff-competitor's prices and then
> contend that by doing so it is meeting competition.
> Section 8-22-8 should not be used offensively to ensure
> that a defendant's price of gasoline will always be below
> its competition. Therefore, the meeting competition
> defense is not available to a defendant that knowingly
> sets its prices below those of its competitor.

*McGuire Oil Company v. Mapco, Inc.*, 612 So. 2d 417, 423-24 (Ala.
1992) (answering questions certified by the Eleventh Circuit).

### 2. Irreparable Harm

Some cases have described a showing of "irreparable harm" as

17

"the *sine qua non* of injunctive relief." *Northeastern Florida
Chapter*, 896 F.2d at 1285 (quoting *Frejlach v. Butler*, 573 F.2d
1026, 1027 (0th Cir. 1978)).

> The injury must be neither remote nor speculative, but
> actual and imminent. ... An injury is "irreparable"
> only if it cannot be undone through monetary remedies.
> The key word in this consideration is irreparable. Mere
> injuries, however substantial, in terms of money, time
> and energy necessarily expended in the absence of a stay
> are not enough.    The possibility that adequate
> compensatory or other corrective relief will be available
> at a later date, in the ordinary course of litigation,
> weighs heavily against a claim of irreparable harm.  ...

*Northeastern Florida Chapter*, 896 F.2d at 1285 (citations and
internal quotation marks omitted).

Plaintiffs argue, however, that such a showing is not required
by Alabama Code § 8-22 17(a). They assert that, when "the Alabama
legislature found that marketing of motor fuel is affected with the
public interest, that fuel distributors are unable to survive
predatory subsidized pricing, that subsidized pricing is inherently
predatory, is reducing competition, and it allowed to continue,
will threaten the public." they are relieved of the procedural
burden of demonstrating they will suffer irreparable harm if the
injunction does not issue. (Post Trial Brief of Plaintiffs (Doc.
No. 12), at 1 (emphasis in original)). Plaintiffs present four
cases in support of that argument: *Gresham v. Windrush Partners*,

18

Ltd., 730 F.2d 1417 (11th Cir. 1984); *Government of the Virgin
Islands v. Virgin Islands Paving, Inc.*, 714 F.2d 283 (3d Cir.
1983); *The Atchison, Topeka and Santa Fe Railway Co. v. Lennen*, 640
F.2d 255 (10th Cir. 1981); and *United States v. Hayes International
Corporation*, 415 F.2d 1030 (5th Cir. 1969).[13]

In *Hayco*, the Attorney General filed a complaint pursuant to
Title VII of the Civil Rights Act of 1964 on behalf of 145 African-
American employees of the defendant. The complaint alleged that
the company maintained racially segregated divisions and lines of
progression, discriminated in hiring practices, and assigned
Caucasians to jobs offering higher pay and better benefits than
similarly qualified minority employees. The Attorney General
sought preliminary injunctive relief, but the request was denied.
On interlocutory appeal, the former Fifth Circuit reversed, saying
in pertinent part:

> It is true that this court has followed the view that an
> injunction does not follow as a matter of course upon
> either a finding or stipulation of violation of some Act
> of Congress. ...
>     Where, as here, the statutory rights of employees
> are involved and an injunction is authorized by statute
> and the statutory conditions are satisfied as in the
> facts presented here, the usual prerequisite of
> irreparable injury need not be established and the agency

---

[13] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(en
banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit
decisions handed down prior to the close of business on September 30, 1981.

> to whom the enforcement of the right has been entrusted
> is not required to show irreparable injury before
> obtaining an injunction. ... We take the position that
> in such a case, irreparable injury should be presumed
> from the very fact that the statute has been violated.

*Hayes*, 415 F.2d at 1044-45 (citations and footnote omitted).

The *Gresham* case addressed the propriety of a preliminary
injunction against the owners of a federally subsidized housing
project for violations of the Federal Fair Housing Act of 1968. On
interlocutory appeal, defendants contended plaintiffs had not
proven they would suffer irreparable harm if the injunction did not
issue. The Eleventh Circuit rejected that argument by specifically
relying upon, and quoting, those portions of the *Hayes* opinion set
out above. *Gresham*, 730 F.2d at 1423.[14] The *Gresham* court also
held that

> We agree with the district court that irreparable
> injury may be presumed from the fact of discrimination
> and violations of fair housing statutes. ... In the
> case at hand the district court found certain specific
> violations of the regulations implementing the Fair
> Housing Act. The Act and its regulations prohibit
> certain discriminatory practices without regard to their
> actual effect on the community. We hold that when a
> plaintiff who has standing to bring suit shows a
> substantial likelihood that a defendant has violated
> specific fair housing statutes and regulations, that
> alone, if unrebutted, is sufficient to support an
> injunction remedying those violations. ...

---

[14] It bears noting that Judge Elbert Parr Tuttle authored both *Hayes* and
*Gresham*.

20

*Id.* (citations omitted); *see also Remed Recovery Care Centers v. Township of Willistown*, 36 F.Supp.2d 676, 687-88 (E.D. Pa. 1999) (relying on *Gresham* when granting preliminary injunction under Fair Housing Amendments Act).

The Third Circuit's opinion in *Government of the Virgin Islands* reversed the district court's denial of a preliminary injunction against defendants' violation of environmental laws, saying in part:

> The enactment of a comprehensive regulatory scheme is a reflection of the Legislature's view of the importance of the interests at stake. Both statutes involved, the Air Pollution Control Act and the Coastal Zone Management Act, contain explicit findings and statements with regard to the problems sought to be addressed and the importance of the regulations to the health and overall quality of the environment of the Virgin Islands. ...
>
> ...
>
> Numerous cases support the Government of the Virgin Islands' assertion that when a statute contains, either explicitly or implicitly, a finding that violations will harm the public, the courts may grant preliminary equitable relief on a showing of a statutory violation without requiring any additional showing of irreparable harm. ... We held in *United States Postal Service v. Beamish*, 466 F.2d 804 (3d Cir. 1972), that a statutory provision authorizing preliminary injunctive relief upon a showing of probable cause to believe that the statute is being violated may be considered a substitute for a finding of irreparable harm for purposes of a preliminary injunction under Rule 65. ...

*Government of the Virgin Islands*, 714 F.2d at 286 (citations

omitted).

Finally, in *Atchison, Topeka and Santa Fe Railway Co.*, the Tenth Circuit reversed a district court for denying a preliminary injunction preventing state officials from collecting property taxes in excess of what several railroads believed they owed for the first half of the 1980 taxes, saying in part:

> Moreover, it is not necessary that the Railroads show that they will suffer irreparable harm if the injunction is denied. When the evidence shows that the defendants are engaged in, or about to be engaged in, the act or practices prohibited by a statute which provides for injunctive relief to prevent such violations, irreparable harm to the plaintiffs need not be shown.
> . . .

*Atchison, Topeka and Santa Fe Railway Co.*, 640 F.2d at 259; *see also Shadid v. Fleming*, 160 F.2d 752, 753 (10th Cir. 1947) ("Where an injunction is authorized by statute it is unnecessary for plaintiff to plead and prove the existence of the usual equitable grounds, irreparable injury and absence of an adequate remedy at law. It is enough if the requirements of the statute are satisfied.").

The construction of Alabama Code § 8-22-17(a) urged upon this court by plaintiffs also is supported by *Henderson v. Burd*, 133 F.2d 515 (2d Cir. 1943). There, the wartime Administrator appointed by the President to enforce the provisions of the

22

Emergency Price Control Act of 1942 obtained a preliminary
injunction enjoining defendants from selling nylon hose at prices
in excess of the maximum prices established for manufacturers by
the Office of Price Administration, and from buying or selling any
hosiery, other than nylon, at prices in excess of those established
by any other applicable maximum price regulation.  The wording of
the federal statute upon which the injunction was sought and
obtained in *Henderson* bears some resemblance to the Alabama
statute.

> Whenever in the judgment of the Administrator any person
> has engaged or is about to engage in any acts or
> practices which constitute or will constitute a violation
> of any provisions of section 4 of this Act, ... he may
> make application to the appropriate court for an order
> enjoining such acts or practices, or for an order
> enforcing compliance with such provisions, and upon a
> showing by the Administrator that such person has engaged
> or is about to engage in any such act or practices a
> permanent or temporary injunction, restraining order, or
> other order shall be granted without bond.

Sec. 205(a) of the Emergency Price Control Act of 1942, 56 Stat.
23, 50 U.S.C. App. Supp. II, § 925 (emphasis supplied).   The
defendants contended, among other arguments advanced on appeal,
that the district court erred in granting preliminary injunctive
relief in the absence of proof of irreparable harm.   The Second
Circuit rejected that argument, saying "[t]he contention that the
plaintiff failed to prove the existence of the usual equitable

grounds for relief, such as irreparable damage, is plainly irrelevant. Where an injunction is authorized by statute it is enough if the statutory conditions are satisfied." *Henderson*, 133 F.2d at 517.

The *Henderson* court cited *Securities and Exchange Commission v. Torr*, 87 F.2d 446 (2d Cir. 1937), as authority for its holding. In *Torr*, the SEC obtained a preliminary injunction enjoining defendants from touting stock in a movie production company "as a good investment," without also disclosing to prospective investors that defendants would be paid commissions if purchases resulted from such recommendations. The language of the statute under which the injunction was obtained in *Torr*, section 21(e) of the Securities Exchange Act of 1934, was similar to the Emergency Price Control Act addressed in *Henderson*, and also bears some resemblance to the Alabama statute at issue here.

> Whenever it shall appear to the Commission that any person is engaged <u>or about to engage</u> in any acts or practices which constitute <u>or will constitute</u> a violation of the provisions of this title (chapter), or of any rule of regulation thereunder, it may ... bring an action ... to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order <u>shall be granted</u> without bond.

*Torr*, 87 F.2d at 449 (*quoting* 15 U.S.C.A. § 78u(e)) (emphasis supplied). On the pertinent issue of whether a plaintiff seeking

24

preliminary injunctive relief on the basis of a federal statute prescribing that such relief "shall be granted" when a violation or threatened violation of the Act is established, the Second Circuit had this to say:

>     As the issuance of an injunction in cases of this nature has statutory sanction, it is of no moment that plaintiff has failed to show threatened irreparable injury or the like, for it would be enough if the statutory conditions for injunctive relief were made to appear. ... But, when such statutory prerequisites are alone relied on, the unambiguous language of the statute is to be given its effect. ... That language in this instance conditions the right upon sufficient proof that "any person is engaged or about to engage in any act, or practices which constitute or will constitute a violation" of the statute.

*Torr*, 87 F.2d at 450 (emphasis supplied).[15]

The common thread lacing through the foregoing decisions is this: when construing statutes designed to eradicate social evils, conserve the environment, promote the free flow of interstate commerce, or impose restraints on domestic inflation during time of war, the tendency of federal courts has been to hold that an individual plaintiff is relieved of the burden of demonstrating

---

[15] But see Rondeau v. Mosinee Paper Corp., 442 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975); Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944). *Cf.* Chandler v. James, 180 F.3d 1254, 1272 n.13 (11th Cir. 1999) (Tjoflat, J., concurring) (construing *Hecht* as "holding, in regard to ... the Emergency Price Control Act, that the traditional rules of equity still apply to the granting of injunctions"). This court is of the opinion that *Rondeau* and *Hecht* merely cast a cautionary shadow across, but do not entirely eclipse, the precedential value of *Henderson* and *Torr*.

irreparable harm as a precondition for preliminary injunctive relief.  Rather, in such situations the focus has been upon the public interest — especially when the statute contains an explicit finding that violations will harm the public — and irreparable harm is presumed, subject always to the right of a defendant to rebut the presumption.

The AMFMA is similar to the statutes addressed in the decisions discussed.  That Act contains explicit legislative findings and declarations with regard to the importance of the regulations imposed upon the marketing of motor fuels in Alabama to the public interest.  The Alabama Supreme Court declared all but one section of the Act constitutional under the State's basic charter in *Galanos,* 519 So. 2d at 1287-88,[16] principally "[b]ecause the tenor of this Act is to prevent monopolization and because the motor fuel marketing business has the potential for monopolization...." *Id.* at 1285.

Ultimately, however, the federal authorities submitted by plaintiffs and found by this court are merely informative, not dispositive. The issue should be decided as a matter of state, not federal, law.  If application of state principles of statutory

---

[16] The *Galanos* Court struck down section 8-22-18. State ex rel Galanos v. Mapco Petroleum, Inc., 519 So. 2d 1275, 1287 (Ala. 1987).

26

construction to the language of section 8-22-17(a) indicates that irreparable harm is not a necessary element of proof, then that is a matter of state substantive law, binding upon this court in a diversity action. *See, e.g., Palmer v. Hoffman*, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed.2d 645 (1943); *Wynfield Inns v. Edward Leroux Group, Inc.*, 896 F.2d 483 (11th Cir. 1990).

The Alabama Supreme Court instructs that the "cardinal rule" of statutory construction is "to determine and give effect to the intent of the legislature as manifested in the language of the statute." *Ex parte State Department of Revenue*, 683 So. 2d 980, 983 (Ala. 1996). Another "basic principle of statutory construction is that it will be presumed that every word, sentence, or provision of a statute has meaning and effect." *J.W. Hartlein Construction Co. v. Seacrest Assoc., L.L.C.*, 1999 WL 148237, at *2 (Ala.Civ.App. Mar. 19, 1999) (citing *Ex parte Children's Hospital of Alabama*, 721 So. 2d 184 (Ala.Civ.App. 1998)). The Alabama Supreme Court also "presume[s] that the Legislature knows the meaning of the words it uses in enacting legislation." *Ex parte Jackson*, 614 So.2d 405, 407 (Ala. 1993). Further,

> [w]ords used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If

the language of the statute is unambiguous, then there is
no room for judicial construction and the clearly
expressed intent of the legislature must be given effect.

*IMED Corp. v. Systems Engineering Associates Corp.*, 602 So. 2d 344,

346 (Ala. 1992). It is through such lens that this court must read

the language of that section upon which plaintiffs base their claim

for *pendente lite* relief.

(a) <u>Any person</u> injured by any violation, or <u>who
would suffer injury</u> from any <u>threatened violation</u>, of
this chapter may maintain an action in any court of
equity jurisdiction to prevent, restrain, or enjoin such
violation or <u>threatened violation</u>. If in such action a
violation or threatened violation of the chapter shall be
established, <u>the court shall enjoin and restrain</u>, or
otherwise prohibit, such violation or <u>threatened
violation</u> and, in addition thereto, the court shall
assess in favor of the plaintiff and against the
defendant the costs of suit, including reasonable
attorney's fees. <u>In such action it shall not be
necessary that actual damages to the plaintiff be alleged
or proved</u>, but where alleged or proved, the plaintiff in
said action, in addition to such injunctive relief and
cost of suit, including reasonable attorney's fees, shall
be entitled to recover from the defendant the damages
sustained by him.

Alabama Code § 8-22-17(a) (emphasis supplied).

The emphasized words and phrases support plaintiffs' argument

that proof of irreparable harm, in the sense of injury that already

has occurred, is not required. That is indicated by the

legislature's use of phrases such as "[a]ny person ... who would

suffer injury" and "threatened violation," which are in the future

28

tense, forward looking: they make assertions about anticipated events that have not yet occurred. Further, the statement that "[i]n such action it shall not be necessary that actual damages to the plaintiff be alleged or proved" reinforces the construction that proof of irreparable harm, in the sense of injury that already has occurred, is not required to justify the issuance of injunctive relief.

In an analogous situation, the Alabama Supreme Court just recently construed the phrase "is liable" found in section 8-6-19(a)(1) of the Alabama Securities Act as a declaration by the Alabama Legislature that proof of proximate causation is not a required element of an action based on that statute. *Ritch v. Robinson-Humphrey Company*, 1999 WL 1001214 (Ala. Nov. 5, 1999) (answering question certified by Eleventh Circuit); *Ritch v. Robinson-Humphrey Co.*, 142 F.3d 1391 (11th Cir. 1998). The statutory phrase construed in *Ritch*, "is liable," is a declarative statement, while the legislative statement before this court, "shall enjoin and restrain," is mandatory and obligatory.

For all of the foregoing reasons, this court concludes that proof of irreparable harm is not required as a precondition for either a temporary restraining order or preliminary injunctive

29

relief in an action based upon Alabama Code § 8-22-17(a).

But even if this court be mistaken in that view, the issue of whether section 8-22-17(a) relieves a plaintiff of the burden of demonstrating irreparable harm probably is a moot point. Tomco's damages are too speculative to be compensated through a monetary award. Tomco only recently opened its station, and cannot rely upon historical business records to determine what its sales volumes typically would have been, absent Murphy's pricing practices. Tomco's Shell station, unlike Campbell's Conoco station, never operated without the presence of Murphy Oil's pricing practices. Only through speculation can Tomco determine what its gross volume would have been if Murphy had complied with the AMFMA. *See Money Back, Inc. v. Gray*, 569 So. 2d 325, 328 (Ala. 1990) (excluding that portion of plaintiff's damage award based on an expert's "upward trend" analysis, because such testimony was "too speculative to justify the ... award"). Thus, the court concludes that Tomco's injury is irreparable, because its damages are estimable only by conjecture and not by any objective standard.

**3. Balancing the Harm**

The focus at this stage of analysis is on the harm that may occur between the issuance of an injunction and a final hearing on the merits. *See United States v. Lambert*, 695 F.2d 536, 539 (11th

30

Cir. 1983). Plaintiffs established that Murphy's pricing practices have resulted in a significant loss of revenues by competitors within the same market area. Campbell has contemplated the closure of its Conoco station. Tomco's new station is significantly below projected sales volumes, and is not making any profit to cover the $1,300,000 investment.

For such reasons the court is satisfied that plaintiffs also have demonstrated that the threatened injury to them outweighs whatever damage the proposed injunction may cause the opposing party.

**4. Injunction Will Serve the Public Interest**

The purpose and intent of the AMFMA is "to encourage fair and honest competition, and to safeguard the public against creation of monopolies or unfair methods of competition, in transactions involving the sale of, or offer to sell, or inducement to sell motor fuel in the wholesale and retail trades in this state." Alabama Code § 8-22-3. As United States District Judge Wm. Bevard Hand observed in another case based on the same Act, "Alabama has an interest in preventing unfair and dishonest competition, monopolies and price wars. The [AMFMA] protects those interests and thereby protects both independent retailers, and the general consuming public." *State of Alabama ex rel. Galanos v. Star*

31

*Service & Petroleum Co.*, 616 F. Supp. 429, 431 (S.D. Ala. 1985) (internal citation omitted). For example, when a retail gasoline dealer launches a "price war" by selling gasoline below its costs in a particular market area, the losses sustained by the belligerent generally are covered, or "subsidized" by profits earned at other locations outside the market area.[17] While such below market prices are favored by the consuming public during the competitive conflict, the salutary economic benefits may be temporary. The Alabama Legislature found that "[s]ubsidized pricing is inherently predatory and is reducing competition in the petroleum industry, and if it continues unabated, will ultimately threaten the consuming public." Alabama Code § 8-22-2(4).

By entering an injunction, therefore, the court simply will be requiring Murphy to comply with Alabama law.

---

[17] Alabama Code § 8-2-2(2) defines several ways in which "price war" losses may be subsidized by profits earned in other operations:

> Unfair competition in the marketing of motor fuel occurs whenever costs associated with the marketing of motor fuel are recovered from other operations, allowing the refined motor fuel to be sold at subsidized prices. Such subsidies most commonly occur in one of three ways: when refiners use profits from refining of crude oil to cover below normal or negative returns earned from motor fuel marketing operations; where a marketer with more than one location uses profits from one location to cover losses from below-cost selling of motor fuel at another location; and where a business uses profits from nonmotor fuel sales to cover losses from below-cost selling of motor fuel.

The Alabama Supreme Court has noted yet a fourth example of illegal subsidization: "[A] retailer cannot pool the costs of the various grades of gasoline and thereby sell one grade below the individual cost of that grade." *Galanos*, 519 So. 2d at 1285 n.5 (*citing with approval* Star Service & Petroleum Co. v. Star ex rel. Galanos, 518 So. 2d 126 (Ala.Civ.App. 1986)).

### III.  CONCLUSION

The court finds that plaintiffs' motion for a temporary restraining order is due to be granted.  An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this  15th  day of December, 1999

_____
United States District Judge