UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

00 JAN -3 PM 3: 18

U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED

JAN - 3 2000

|  |  |
|---|---|
| CAMPBELL & SONS OIL COMPANY, ) | |
| INC., THRASHER OIL COMPANY, ) | |
| INC., and TOMCO, INC., ) | |
|  ) | |
| Plaintiffs, ) | |
|  ) | |
| vs. ) | Civil Action No. CV-99-S-3176-NE |
|  ) | |
| MURPHY OIL USA, INC., ) | |
|  ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

This action is before the court on plaintiffs' motion for preliminary injunctive relief. Upon consideration of the pleadings, evidence produced during hearings held December 7, 8, and 27, 1999, and the arguments and briefs of counsel, the court enters the following opinion.

## I. BACKGROUND

Plaintiffs are Alabama corporations that sell motor fuels at wholesale and retail within the State of Alabama. Campbell & Sons Oil Company, Inc. ("Campbell") owns and operates 28 retail gasoline stations in Madison County, Alabama. Twenty-five of those stations are "branded," selling either Texaco or Conoco petroleum products, while the remainder are "unbranded" and sell motor fuels under the trade name of "Liberty 2000." One of Campbell's Conoco-branded stations is located on South Memorial Parkway in Huntsville,

Alabama, approximately one mile south of the defendant's station that is discussed below.

Plaintiffs Thrasher Oil Company, Inc. ("Thrasher") and Tomco, Inc. ("Tomco")[1] are related Alabama corporations, in that the same persons own all shares of stock in both entities. As best this court can ascertain from the evidence thus far presented, Thrasher sells Shell petroleum products at wholesale, principally to Tomco, which in turn resells at retail through approximately eighteen convenience store stations in Madison County, Alabama. Two such retail outlets are located on South Memorial Parkway in Huntsville, Alabama, but the station upon which the testimony has focused is located just a short distance south of defendant's facility discussed below. The business relationships and interests associated with that station are convoluted. The real property and improvements constructed thereon are owned by a third person, who leases it to Thrasher; and that entity, as noted above, sells gasoline at wholesale to Tomco, which resells it at retail.[2] Even though the President of Thrasher testified that retail losses

---

[1] Tomco was added as a party by amendment to plaintiffs' complaint on December 13, 1999 (Doc. No. 14). Such an amendment was proper pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, because defendant had not filed an answer or any other responsive pleading.

[2] The exact contours of the contractual relationships among the various parties holding financial interests in the station have not been disclosed, but they probably do not differ appreciably from those between Williams Petroleum Company and the owner of "Mojo's Deli" discussed *infra*.

2

sustained at that location are suffered equally by Thrasher and

Tomco, "because the control group is the same," this court is of

the opinion that Tomco is the proper party with standing to

complain of defendant's pricing practices, at least as to the Shell

station upon which the evidence has thus far focused.[3]

Defendant Murphy Oil USA, Inc. ("Murphy") is an Arkansas

corporation headquartered in El Dorado, Arkansas.   The company

---

[3] State law guides the determination of standing in diversity cases.  See
Beckman Cotton Company v. First National Bank of Atlanta, 666 F.2d 181, 183 (11th
Cir. 1982).  Generally, under the law of Alabama a plaintiff establishes standing
to sue by "alleg[ing] an injury directly arising from or connected with the wrong
alleged ...."  Ex parte Blue Cross & Blue Shield of Alabama, 582 So. 2d 469, 474
(Ala. 1991).  When a statute prohibits certain conduct and delineates the persons
entitled to seek redress for such conduct, the text of that statute determines
standing.

In Russell v. Birmingham Oxygen Service, Inc., 408 So. 2d 90 (Ala. 1981),
the Supreme Court of Alabama refused to permit a wholly-owned subsidiary to
enforce a non-compete agreement executed by the subsidiary's parent corporation
and a third party, absent evidence of intent to create an assignment.  Even
though one stockholder owned both the parent and the subsidiary, the Russell
court found that the subsidiary lacked standing:

> Appellees argue that it makes no difference whether Birmingham
> Oxygen [the parent] or Southeastern Medical [the subsidiary]
> enforces the non-competition agreement, since Barney C. Eller wholly
> owns both corporations and it was him with whom Edwards and Russell
> dealt.   This contention is without merit.   A corporation is an
> entity created by compliance with statutory requirements.   A
> corporation has the right to sue and be sued just like a natural
> person. ... A corporation, just like an individual, must enforce its
> own rights and privileges.

Id. at 93 (emphasis supplied).   The decision in Russell indicates that Tomco
"must enforce its own rights and privileges."  Among these rights is the ability
to sue a fellow retailer, like Murphy Oil USA, Inc., for sale of fuel below cost,
"where the effect is to injure competition."  Ala. Code § 8-22-6.  "Competition"
in the Alabama Motor Fuels Marketing Act encompasses "any person who competes
with another person in the same market area at the same level of distribution."
Id. § 8-22-4(13) (emphasis supplied).   This indicates that Thrasher, as a
wholesaler of the gasoline sold by Tomco at the Shell station located adjacent
to defendant's facility, lacks standing to sue Murphy Oil USA, Inc., for
injurious competition at the retail level.

3

allegedly is "a vertically integrated producer with worldwide exploration and production activities, refining activities, and wholesale and retail marketing operations" earning gross revenues in 1998 of "almost $2 billion." (Complaint ¶ 2.) Murphy opened a retail gasoline outlet on the property of a Wal-Mart "SuperCenter" situated on South Memorial Parkway in Huntsville, Alabama, on July 31, 1999. Even though it would be inappropriate to modify the noun "station" with the adjective "service" when describing Murphy's facility, because it consists of only four pumps monitored by an attendant housed in a small kiosk, the outlet, nevertheless, has been remarkably successful in attracting consumers. It surpassed Murphy's "target projection" of 175,000 gallons a month in just one quarter, selling 130,000 gallons in August, 135,000 gallons in September, 176,000 gallons in October, and 216,000 gallons in November of 1999.[4]

Plaintiffs filed this action on November 30, 1999.[5] They

---

[4] These sales volumes are especially remarkable in view of the fact that, unlike Campbell's nearest Conoco station and Tomco's Shell station, the Murphy station does not front on South Memorial Parkway. Even so, the facility is clearly visible from that roadway, and it can be readily accessed from the Parkway either through the Wal-Mart parking lot (which does front on the Parkway) or via a side street intersecting the Parkway.

[5] The action originally was filed in the Circuit Court for Madison County, Alabama, but was removed to this court by defendant on December 1, 1999, pursuant to 28 U.S.C. §§ 1332, 1441, 1446. Plaintiffs moved to remand (Doc. No. 5), asserting this court lacked subject matter jurisdiction because the amount in controversy did not exceed the $75,000. The court received evidence on that issue on December 7, 1999, and determined that the value to plaintiffs of the rights sought to be enforced by injunction was greater than the jurisdictional

4

allege that Murphy is selling motor fuel below its costs in violation of the Alabama Motor Fuel Marketing Act of 1984 ("AMFMA" or "the Act"), Alabama Code §§ 8-22-1 through 8-22-17, and seek injunctive relief in accordance with section 8-22-17(a).

## II. DISCUSSION

### A. Standards for Entry of a Preliminary Injunction

To justify the entry of a preliminary injunction, plaintiffs must satisfy four prerequisites: (1) demonstrate a substantial likelihood of ultimately prevailing on the merits; (2) show they will suffer irreparable harm if an injunction maintaining the status quo *pendente lite* does not issue; (3) prove that the threatened injury to plaintiffs outweighs whatever damage the proposed injunction may cause the opposing party; and (4) demonstrate that the injunction will not be adverse to the public interest. *E.g.*, *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998); *Northeastern Florida Chapter of the Association of General Contractors of America v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990). *See generally* 11A Wright, Miller &

---

threshold. *See, e.g.*, Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 347, 97 S.Ct. 2434, 2443, 53 L.Ed.2d 383 (1977) ("In actions seeking declaratory or injunctive relief, ... the amount in controversy is measured by the value of the object of the litigation."); Ericsson GE Mobile Communications v. Motorola Communications & Electronics, Inc., 120 F.3d 216, 218 (11th Cir. 1997).

5

Kane, *Federal Practice and Procedure: Civil 2d* § 2948, at 131-33

(2d ed. 1995). Each of these factors is discussed in the following

sections.

## 1.   Likelihood of Success on the Merits

The requirement that a movant demonstrate a substantial

likelihood of ultimately prevailing on the merits does not mean

that the movant must show that it is certain to succeed on the

merits. *See Johnson v. United States Department of Agriculture,*

734 F.2d 774, 782 (11th Cir. 1984); 11A Wright, Miller & Kane,

*supra* § 2948.3, at 188 & n.5. The movant simply must show a

"likelihood" of success, because of the underlying rationale of

both temporary restraining orders and preliminary injunctions:

> The purpose of a preliminary injunction is merely to
> preserve the relative positions of the parties until a
> trial on the merits can be held. Given this limited
> purpose, and given the haste that is often necessary if
> those positions are to be preserved, a preliminary
> injunction is customarily granted on the basis of
> procedures that are less formal and evidence that is less
> complete than in a trial on the merits. A party thus is
> not required to prove his case in full at a preliminary-
> injunction hearing, ... and the findings of fact and
> conclusions of law made by a court granting a preliminary
> injunction are not binding at trial on the merits.

*University of Texas v. Camenisch,* 451 U.S. 390, 394, 101 S.Ct.

1830, 1833, 68 L.Ed.2d 175 (1981). Here, plaintiffs have

demonstrated a clear probability of success on the merits.

6

The Alabama Supreme Court has held that three sections of the AMFMA, sections 8-22-3, -6, and -9, must be construed together. *State ex rel. Galanos v. Mapco Petroleum, Inc.*, 519 So. 2d 1275, 1286 (Ala. 1987).[6] Section 3 contains a declaration of the legislature's intent, and it reads as follows:

> It is hereby declared that marketing of motor fuel in Alabama is affected with the public interest. It is hereby declared to be the legislative intent to encourage fair and honest competition, and to safeguard the public against creation of monopolies or unfair methods of competition, in transactions involving the sale of, or offer to sell, or inducement to sell motor fuel in the wholesale and retail trades in this state. It is further declared that the advertising, offering for sale, or sale of motor fuel below cost or at a cost lower than charged other persons on the same marketing level with the intent of injuring competitors or substantially lessening competition is an unfair and deceptive trade practice. The policy of the state is to promote the general welfare through the prohibition of such sales. The purpose of the Motor Fuel Marketing Act is to carry out that policy in the public interest, providing for exceptions under stated circumstances, providing for enforcement and providing penalties.

Ala. Code § 8-22-3 (1975). Section 6 prohibits certain "below cost fuel sales" in the following words:

> It shall be unlawful for any person engaged in commerce in this state to sell or offer to sell motor fuel below cost or to sell or offer to sell it at a price lower than the seller charges other persons on the same

---

[6] The Alabama Supreme Court so held, because the act of reading each section "literally and in isolation might well lead to a conclusion that they are unreasonably overbroad or void for vagueness...." State ex rel. Galanos v. Mapco Petroleum, Inc., 519 So. 2d 1275, 1286 (Ala. 1987).

7

day and on the same level of distribution, within the same market area, where the effect is to injure competition.

*Id.* § 8-22-6.  Finally, section 9 provides that:

It shall be unlawful under this section:
(1) For any person engaged in commerce in this state to sell or offer to sell motor fuel at wholesale or retail, as the case may be, where the effect is to injure competition.
(2) For any person, where the effect is to injure competition, to offer a rebate, to offer to give a rebate, to offer a concession of any kind in connection with the sale of motor fuel.
(3) For any retailer to induce or attempt to induce or to procure or attempt to procure the purchase of motor fuel at a price less than cost to wholesaler. Any person who violates any provision of this section shall be subject to the provisions and penalties of this chapter.

*Id.* § 8-22-9.

The Act elsewhere defines the terms "sale or sell" as meaning "[a]ny transfer for a combination, exchange, barter, gift, offer for sale, advertising for sale, soliciting an order for motor fuel and distribution in any manner or by any means whatsoever." *Id.* § 8-22-4(7).  Section 10 of the AMFMA expands that definition by providing that:

In all advertisements, offers for sale or sales involving two or more items, at least one of which items is motor fuel, at a combined price, and in all advertisements, offers of sale, or sales, involving the giving of any gift or concession of any kind whatsoever (whether it be coupons or otherwise), the wholesaler's or retailer's combined selling price shall not be below the

8

> cost to the wholesaler or the cost to the retailer,
> respectively, of the total of all articles, products,
> commodities, gifts, and concessions included in such
> transactions, except that if any such articles, products,
> commodities, gifts, or concessions, shall not be motor
> fuel, the basic cost thereof shall be determined in like
> manner as provided in subdivision (14) of Section 8-22-4.

*Id.* § 8-22-10. Both sections fold back upon section 8-22-9(2), set out above, which makes it unlawful for "any person"[7] to offer a "rebate" or "concession of any kind in the sale of motor fuel" when the "effect" of such practice "is to injure competition."

### a.   Elements of a prima facie case

Reading the foregoing sections *in pari materia,* the Alabama Supreme Court declared that plaintiffs must show, first, that defendant sold motor fuel below its costs and, second, that such action had the effect of injuring competition. *Galanos,* 519 So. 2d at 1286 ("[T]he legislature has in explicit terms prohibited sales below cost where the effect is to injure competition."). It is not required that plaintiffs prove defendant intended to injure competition; rather, as Chief Justice Torbert observed in his special concurrence to the *Galanos* decision, "such an intent will be presumed upon a showing that the acts have the effect of injuring competition.  The defendant can rebut that presumption by

---

[7] "Person" is defined expansively, and includes "[a]ny person, firm, association, organization, partnership, business trust, joint stock company, company, corporation, or legal entity."  Ala. Code § 8-22-4(1).

9

proving [as an affirmative defense] the lack of [a harmful]

intent." *Galanos*, 519 So. 2d at 1289 (Torbert, C.J., concurring).

Chief Justice Torbert's statement is but a gloss on the words of

Justice Almon who, in speaking for the Court in *Galanos,* said:

> It may readily be seen [from reading sections 8-22-
> 3, -6, and -9 *in pari materia*] that the legislature has
> in explicit terms prohibited only sales below cost where
> the effect is to injure competition. We think that to
> read the intent provision of § 8-22-3 into these
> provisions so as to place a burden on the [plaintiff] to
> prove intent would be manifestly contrary to the terms of
> the Act.    However, we do think that the various
> provisions of the Act can be read together in a way that
> will save their constitutionality. It is quite consonant
> with the spirit and terms of the Act to construe it as
> providing that the [plaintiff] proves a prima facie case
> when it proves a sale below cost and an injurious effect
> on competition, and yet as allowing the defendant to
> prove lack of a harmful intent either in avoidance of
> liability or in mitigation of any penalty, as the trier
> of fact may determine.

*Galanos*, 519 So. 2d at 1286. Each element of liability and defense

is discussed in the following subsections.

###       i    Sales below cost

Plaintiffs have demonstrated that defendant sold motor fuel

below its costs from November 18 through 24, 1999.   During that

period, Murphy's "laid-in cost" of regular (87 octane) unleaded

gasoline was $1.1529 a gallon.[8]   (See Plaintiffs' Exhibits 1 & 4.)

---

[8] The President of Thrasher Oil testified that the "laid-in cost" of motor
fuel is calculated by adding federal, state, and local taxes, freight costs, and
inspection fees to the "rack price": *i.e.,* the amount paid for each gallon

10

When Murphy's "cost of doing business"[9] at its South Memorial Parkway station (which Murphy asserts amounted to only 6.8 cents a gallon) is added to its "laid-in cost," the total cost to Murphy for each gallon of regular unleaded gasoline sold at that retail outlet was $1.2209.[10]

Yet, during the period in question — which significantly commenced on the same date that Tomco opened the new Shell-branded

---

purchased at the Duncan Terminal near Birmingham, Alabama (see Plaintiffs' Exhibit 1: a copy of the Oil Price Information Service ("OPIS") listing for the period November 12-29, 1999). As thus defined, the trade idiom "laid-in cost" includes all variables delineated in the statutory term, "cost to retailer," except for the retailer's "cost of doing business" discussed in the following textual paragraph and footnote. See Ala. Code § 8-22-4(16), reading as follows:

(16) Cost to Retailer. As applied to retail sales, the invoice or replacement cost of the motor fuel within five days prior to the date of sale, in the quantity last purchased, whichever is less, less all trade discounts except customary discounts for cash, to which shall be added all applicable state, federal and local taxes, inspection fees, freight cost, if paid by the retailer, plus the cost of doing business. [Emphasis supplied.]

[9] See Ala. Code § 8-22-4(17), defining the "cost of doing business or overhead expenses" as including:

all costs incurred in the conduct of business, including but not limited to: labor (including salaries of executives and officials), rent (which rent must be no less than fair market value based on current use), interest on borrowed capital, depreciation, selling cost, maintenance of equipment, transportation or freight cost, losses due to breakage or damage; credit card fees, or other charges; credit losses, all types of licenses, taxes, insurance, and advertising.

[10] This court only learned through evidence adduced during the preliminary injunction hearing that Murphy operates at least one other retail gasoline station in Madison County, Alabama. (See Plaintiffs' Exhibit 7 (Thrasher gas price survey forms for Nov. 1 through Dec. 6, 1999), at 4, 7, 9, 10, & 12, noting the existence of a Murphy Oil station on Highway 20.) Defendant's attorney asserted during closing argument that the 6.8 cent per gallon overhead expense variable, derived from the testimony of Murphy's Vice President of Regional Marketing during the TRO hearing, is different for its Highway 20 station. That may be so, but Murphy has not presented any contrary evidence.

11

gasoline station and convenience store just south of Murphy's station — Murphy sold regular gas to the general public for $1.049 a gallon. If the consumer presented a "Wal-Mart Gift Card" to the cashier, however, then that price was discounted an additional three cents for each gallon purchased, yielding a net price to the consumer of $1.019 a gallon. In either event, Murphy was selling regular unleaded motor fuel to the general public for 17.19 cents a gallon less (and to Wal-Mart Gift Card holders for 20.19 cents a gallon less) than its costs.[11]

### ii   Injurious effect on competition

Plaintiffs also have demonstrated that such pricing practices had an injurious effect on competition.

The Vice President of Campbell Oil Company testified that, prior to the opening of defendant's Huntsville station, his company's Conoco-branded station nearest Murphy's station sold 60,000 to 65,000 gallons of gasoline each month. The volume for each month since Murphy entered the market has been significantly less: 40,000 gallons in the months of August and September; 29,000 gallons in October; and 41,000 gallons in November of 1999.

---

[11] Even Murphy's own records, which this court does not presently find entirely credible, demonstrate that it was selling regular unleaded gasoline for 7.95 cents a gallon less than its costs on November 18th, 6.53 cents less on November 19th, 8.53 cents less on November 22nd, and 1.20 cents less on November 23, 1999. (See "Today's Margin" on each page of Defendant's Exhibit 7).

12

Moreover, the "mix" of grades sold has changed. Before Murphy entered the market, Campbell's gross monthly sales volume was divided 50% regular unleaded, 25% mid-grade, and 25% premium grade gasoline. In contrast, during the four months following the opening of Murphy's Huntsville station, Campbell's sales have been divided 75% regular unleaded, 15% mid-grade, and only 10% premium grade gasoline. Campbell's losses have been so great that it considered closing the station, but opted to pursue this litigation as a means of avoiding that.

Although Tomco's retail losses are more difficult to quantify, due to the fact that its new outlet opened only a few weeks ago, the President of Thrasher testified that sales have been significantly less than his market projections. Moreover, Tomco has submitted a sales and cash report from its new Shell station (plaintiffs' exhibit 6) that provides a summary of the volume of gas sold from the period of November 18-24, 1999. For instance, on November 18, 1999, the day the station opened, Tomco sold 708 gallons,[12] whereas the Murphy station located just a short distance north sold approximately 7,713 total gallons. The following day Tomco's station sold approximately 1,464 gallons, while Murphy sold 10,410. During Tomco's grand opening week, its sales never

---

[12] These figures have been rounded to the nearest gallon.

13

exceeded 1,600 gallons in any one day.[13]

### iii   Lack of harmful intent

Defendant has failed to rebut the presumption of an intent to injure competition arising upon plaintiffs' proof of a prima facie case.

As the Alabama Supreme Court observed, the State Legislature "provided several exceptions [to the AMFMA] that may be characterized as [affirmative] defenses of 'no injurious intent.'" *Galanos,* 519 So. 2d at 1286. Murphy thus far has relied upon the statutory exception of "meeting competition."

> It is not a violation of this chapter if any price is established in good faith to meet an equally low price

---

[13] When discussing volumes sold by the parties, the court is not basing its decision on the simplistic fact that Murphy's station attracted more customers during the period in question than did plaintiffs' retail outlets. Rather, the court is utilizing those numbers as a rough measurement of the injurious effect of Murphy's illegal pricing practices on two competitors. As such, the finding is not contrary to the holding in *Star Service & Petroleum Co., Inc. v. State,* 518 So. 2d 126, 130 (Ala.Civ.App. 1986):

> We agree with *Star* that it is part of the normal competitive process for competitors to be "injured" when they lose customers to a marketer who offers the public a lower price. Such "injury" is not what the [A]MFMA addresses. Rather, it is injury to competition (which necessarily includes injury to competitors) due to certain unlawful sales tactics, such as selling motor fuel below cost, as in this case. [Emphasis supplied.]

Moreover, the finding is not contrary to the recent decision of the Alabama Supreme Court in *Young Oil Co. v. Racetrac Petroleum, Inc.,* 1999 WL 1207116, at * 7 (Ala. Dec. 17, 1999), holding that "the AMFMA does not penalize petroleum marketers ... for an increase in market share (and concomitantly, a loss of market share by its competitors) resulting from a more efficient operation," because Murphy has failed to demonstrate that its contested retail price of 1.049 a gallon (much less the 1.019 a gallon price offered to Wal-Mart Gift Card holders) included any consideration of Murphy's "cost of doing business or overhead expenses" at the Wal-Mart SuperCenter station on South Memorial Parkway.

14

> of a competitor in the same market area on the same level
> of distribution selling the same or a similar product of
> like grade and quality or is exempt under Section 8-22-
> 13.

Ala. Code § 8-22-8(b); *see also id.* §§ 8-22-12, 8-22-13(a). In
support of that defense, Murphy's Vice President of Regional
Marketing testified that he personally determined the price for
each grade of motor fuel sold at the company's Huntsville station
in reliance upon comparative market price surveys compiled Monday
through Friday (and sometimes on a Saturday or Sunday) of each week
by the station manager. The surveys were transmitted each morning
by facsimile to Murphy's corporate headquarters in Arkansas, where
they were reviewed. Daily decisions about the price to be charged
for each grade of gasoline sold at the Huntsville station for the
remainder of that day, or beginning the following morning, were
handwritten on the bottom of the same faxed survey form and re-
transmitted to the station manager. (*See* Defendant's Exhibits 8
and 9.) This court rejects that evidence for three independent
reasons.

First, the court does not find Murphy's comparative market
price surveys for the period focused upon, November 18th through
the 24th, to be credible. Counsel for plaintiff demonstrated
several inconsistences between the information recorded in those

15

forms and other evidence.   For example, the surveys list two
competitors that allegedly sold regular unleaded gasoline as low as
Murphy during the period in question:  the "Williams Service" and
"Mojo's Deli" stations on South Parkway, both of which were
recorded as selling that grade for $1.04 a gallon continuously from
November 12th through the 23rd.   Williams Petroleum Company owns
and operates the "Williams Service" station referred to, and it
also sells unbranded gasoline at retail through an agreement with
the owner of "Mojo's Deli."   The owner of Williams Petroleum
testified that he did not lower his company's price for regular
unleaded gasoline to $1.04 a gallon at either outlet until November
19th.   In doing so, his company sold below its costs, but did so
for the purpose of meeting the competition posed by Murphy's posted
price.

     Second, Murphy's Huntsville manager allegedly surveys the
prices posted by competitors located "on Memorial Parkway" three to
four miles north, and five to six miles south, of defendant's
station.   The southern leg of that loop, however, carries the
manager over the Tennessee River bridge, into Morgan County,
Alabama.   Not only is that stretch of road no longer "Memorial
Parkway" (rather, it then is U.S. Highway 231), but it enters an
area that traditionally has been referred to as "Gasoline Alley,"

16

because of the numerous branded and unbranded stations clustered there. The area is not located within the limits of any incorporated town or municipality, and Morgan County does not levy a gasoline tax. It follows, therefore, that each station in Gasoline Alley can sell any grade of motor fuel for four cents a gallon less than any dealer located in Huntsville (which levies a one cent per gallon tax) and Madison County, Alabama (which exacts a three cent per gallon tax). Even so, not one of such stations listed on Murphy's comparative market price surveys[14] sold regular unleaded gasoline for as little as $1.04 a gallon during the period this opinion has focused upon. Thus, even if such stations were deemed to be within "the same market area,"[15] and this court finds at this stage of the litigation that they are not,[16] they still provide no justification for Murphy's challenged pricing practices.

---

[14] "Gasoline Alley" comparators are identified on each sheet of Defendant's Exhibit 9 by the initials "GA."

[15] See Richard A. Posner, Economic Analysis of Law 282 (3d ed. 1986) (noting the tendency of courts when defining market areas "to include in the market those sellers who actually sell to the same group of customers and exclude those who do not"). Cf. United States v. Engelhard Corp., 126 F.3d 1302, 1305 (11th Cir. 1997) ("The boundaries of the product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product and substitutes for it.").

[16] Any finding by the court as to the relevant market area, specifically, the exclusion of Gasoline Alley, is not irrevocable. Indeed, at final hearing on the merits defendant may prove to the contrary by offering evidence of consumer traffic patterns. Cf. Tennessee Truckstop, Inc. v. Mapco Petroleum, Inc., 728 F. Supp. 489 (M.D. Tenn. 1990). The important point of the court's analysis at this stage of the litigation lies in the fact that none of the Gasoline Alley comparators listed on Murphy's price surveys sold regular unleaded gasoline for as little as $1.04 a gallon during the relevant period.

17

Finally, this court finds that Murphy knowingly lowered its price for regular unleaded gasoline to $1.04 a gallon for the general public (and to $1.01 a gallon for holders of Wal-Mart Gift Cards) on the eve or morning of the opening of Tomco's Shell station, and that it did so with the intent of solidifying its competitive position in relation to that station, offering far more pumps and amenities in its "convenience store" than Murphy's simple four pump "kiosk." *See Galanos*, 519 So. 2d at 1286 (discussing the "destructive practice of developing clientele and diminishing competitors' business while temporarily suffering a loss in anticipation of higher profits after competitors have been driven out of business"). As a consequence, Murphy cannot claim the benefits of the "meeting competition" affirmative defense.

> We do not agree with the defendant's interpretation that meeting competition means beating competition. Section 8-22-8 is clear and unambiguous. The statute cannot be read so as to allow one defendant-competitor to undercut another plaintiff-competitor's prices and then contend that by doing so it is meeting competition. Section 8-22-8 should not be used offensively to ensure that a defendant's price of gasoline will always be below its competition. Therefore, the meeting competition defense is not available to a defendant that knowingly sets its prices below those of its competitor.

*McGuire Oil Company v. Mapco, Inc.*, 612 So. 2d 417, 423-24 (Ala. 1992); *see also Young Oil Company v. Racetrac Petroleum, Inc.*, 1999

18

WL 1207116, at *7 (Ala. Dec. 17, 1999) (holding that "a retailer's intent [should] be measured at the time the retailer acts").

### 2.   **Irreparable Harm**

Some cases have described a showing of "irreparable harm" as "the *sine qua non* of injunctive relief." *Northeastern Florida Chapter*, 896 F.2d at 1285 (quoting *Frejlach v. Butler*, 573 F.2d 1026, 1027 (8th Cir. 1978)).

> The injury must be neither remote nor speculative, but actual and imminent.  ...  An injury is "irreparable" only if it cannot be undone through monetary remedies. The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough.   The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.  ...

*Northeastern Florida Chapter*, 896 F.2d at 1285 (citations and internal quotation marks omitted).

Plaintiffs argue, however, that such a showing is not required by Alabama Code § 8-22-17(a).  They assert that, when "the Alabama legislature found that marketing of motor fuel is affected with the public interest, that fuel distributors are unable to survive predatory subsidized pricing, that subsidized pricing is inherently predatory, is reducing competition, and if allowed to continue, will threaten the public," they are relieved of the burden of

19

demonstrating they will suffer irreparable harm as a precondition for preliminary injunctive relief. (Post Trial Brief of Plaintiffs (Doc. No. 12), at 1 (emphasis in original)).

Plaintiffs presented four cases in support of that argument: *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417 (11th Cir. 1984); *Government of the Virgin Islands v. Virgin Islands Paving, Inc.*, 714 F.2d 283 (3d Cir. 1983); *The Atchison, Topeka and Santa Fe Railway Co. v. Lennen*, 640 F.2d 255 (10th Cir. 1981); and *United States v. Hayes International Corporation*, 415 F.2d 1038 (5th Cir. 1969).[17] Those decisions, together with two Second Circuit cases found by this court,[18] were discussed at some length on pages 20-26 of the memorandum opinion entered on December 15, 1999, in support of the temporary restraining order. The common thread lacing through all such judgments is this: When construing statutes designed to eradicate social evils, conserve the environment, promote the free flow of interstate commerce, or impose restraints on domestic inflation during time of war, the tendency of federal courts has been to hold that an individual plaintiff is relieved of the burden of demonstrating irreparable harm as a precondition for

---

[17] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)(*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

[18] Henderson v. Burd, 133 F.2d 515 (2d Cir. 1943); Securities and Exchange Commission v. Torr, 87 F.2d 446 (2d Cir. 1937).

20

preliminary injunctive relief. Rather, in such situations the focus has been upon the public interest — especially when the statute under scrutiny contains an explicit finding that violations will harm the public — and irreparable harm is presumed, subject always to the right of a defendant to rebut that presumption. The AMFMA is similar to the statutes addressed in such cases. The Act contains explicit legislative findings and declarations with regard to the importance of the regulations imposed upon the marketing of motor fuels in Alabama to the public interest. The Alabama Supreme Court declared all but one section of the Act constitutional under the State's basic charter in *Galanos*, 519 So. 2d at 1287-88,[19] principally "[b]ecause the tenor of this Act is to prevent monopolization and because the motor fuel marketing business has the potential for monopolization ...." *Id.* at 1285.

Ultimately, however, the federal authorities submitted by plaintiffs and found by this court merely are informative, not dispositive. The issue should be decided as a matter of state law, not federal. If application of state principles of statutory construction to the language of section 8-22-17(a) indicates that irreparable harm is not a necessary element of proof, then that is

---

[19] The *Galanos* Court struck down section 8-22-18. State ex rel. Galanos v. Mapco Petroleum, Inc., 519 So. 2d 1275, 1287 (Ala. 1987).

21

a matter of state substantive law, binding upon this court in a diversity action. *See generally Palmer v. Hoffman*, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed.2d 645 (1943); *Wynfield Inns v. Edward Leroux Group, Inc.*, 896 F.2d 483 (11th Cir. 1990).

The Alabama Supreme Court instructs that the "cardinal rule" of statutory construction is "to determine and give effect to the intent of the legislature as manifested in the language of the statute." *Ex parte State Department of Revenue*, 683 So. 2d 980, 983 (Ala. 1996). Another "basic principle of statutory construction is that it will be presumed that every word, sentence, or provision of a statute has meaning and effect." *J.W. Hartlein Construction Co. v. Seacrest Assoc., L.L.C.*, 1999 WL 148237, at *2 (Ala.Civ.App. Mar. 19, 1999) (citing *Ex parte Children's Hospital of Alabama*, 721 So. 2d 184 (Ala.Civ.App. 1998)). The Alabama Supreme Court also "presume[s] that the Legislature knows the meaning of the words it uses in enacting legislation." *Ex parte Jackson*, 614 So.2d 405, 407 (Ala. 1993). Further,

> [w]ords used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.

22

*IMED Corp. v. Systems Engineering Associates Corp.*, 602 So. 2d 344, 346 (Ala. 1992). It is through such lens that this court must read the language of that section upon which plaintiffs base their claim for preliminary injunctive relief.

> (a) <u>Any person</u> injured by any violation, or <u>who would suffer injury</u> from any <u>threatened violation</u>, of this chapter may maintain an action in any court of equity jurisdiction to prevent, restrain, or enjoin such violation or <u>threatened violation</u>. If in such action a violation or threatened violation of the chapter shall be established, <u>the court shall enjoin and restrain</u>, or otherwise prohibit, such violation or <u>threatened violation</u> and, in addition thereto, the court shall assess in favor of the plaintiff and against the defendant the costs of suit, including reasonable attorney's fees. <u>In such action it shall not be necessary that actual damages to the plaintiff be alleged or proved</u>, but where alleged or proved, the plaintiff in said action, in addition to such injunctive relief and cost of suit, including reasonable attorney's fees, shall be entitled to recover from the defendant the damages sustained by him.

Alabama Code § 8-22-17(a) (emphasis supplied).

The emphasized words and phrases support plaintiffs' argument that proof of irreparable harm, in the sense of injury that already has occurred, is not required. That is indicated by the legislature's use of phrases such as "[a]ny person ... who would suffer injury" and "threatened violation," which are in the future tense, forward looking: They make assertions about anticipated events that have not yet occurred. In contrast, the language of

23

section 8-22-17(b) is restricted to "[a] person injured as a result of an act or practice which violates this chapter" and, accordingly, speaks in the past tense, looking backwardly at events that already have occurred.

Further, subsection (a)'s statement that "[i]n such action it shall not be necessary that actual damages to the plaintiff be alleged or proved" reinforces the construction that proof of irreparable harm, in the sense of injury that already has occurred, is not required to justify the issuance of injunctive relief. In comparison, subsection (b) provides that "[a]ny actual damages found to have resulted from violations of this chapter shall be trebled by the court in making its award." (Emphasis supplied.) Again, the focus of subsection (b)'s emphasized words is backward looking; the injury already has occurred and consequently can be objectively measured and compensated through an award of actual damages, which the court is required to treble.

This court's construction of the relevant statutory language also is supported by a recent decision of the Alabama Supreme Court, construing the phrase "is liable" found in section 8-6-19(a)(1) of the Alabama Securities Act as a declaration by the Alabama Legislature that proof of proximate causation is not a required element of an action based on that statute. *Ritch v.*

24

*Robinson-Humphrey Company*, 1999 WL 1001214 (Ala. Nov. 5, 1999) (answering question certified by Eleventh Circuit in *Ritch v. Robinson-Humphrey Co.*, 142 F.3d 1391 (11th Cir. 1998)). The statutory phrase construed in *Ritch*, "is liable," is a declarative statement, while the legislative statement before this court, "shall enjoin and restrain," is mandatory and obligatory.

For all of the foregoing reasons, this court concludes that proof of irreparable harm is not required as a precondition for preliminary injunctive relief in an action based upon Alabama Code § 8-22-17(a).

But even if this court be mistaken in that view, the issue of whether section 8-22-17(a) relieves a plaintiff of the burden of demonstrating irreparable harm probably is a moot point. Tomco's damages are too speculative to be compensated through a monetary award. Tomco only recently opened its station, and cannot rely upon historical business records to determine what its sales volumes typically would have been, absent Murphy's pricing practices. Tomco's Shell station, unlike Campbell's Conoco station, never operated without the presence of Murphy Oil's pricing practices. Only through speculation can Tomco determine what its gross volume would have been if Murphy had complied with

25

the AMFMA. *See Money Back, Inc. v. Gray*, 569 So. 2d 325, 328 (Ala. 1990) (excluding that portion of plaintiff's damage award based on an expert's "upward trend" analysis, because such testimony was "too speculative to justify the ... award"). Thus, the court concludes that Tomco's injury is irreparable, because its damages are estimable only by means of the conjectural opinions of expert witnesses, and not by any objective standard.

### 3. Balancing the Harm

The focus at this stage of analysis is on the harm that may occur between the issuance of an injunction and a final hearing on the merits. *See United States v. Lambert,* 695 F.2d 536, 539 (11th Cir. 1983). Plaintiffs established that Murphy's pricing practices have resulted in a significant loss of revenues by competitors within the same market area. Campbell has contemplated the closure of its Conoco station. Tomco's new station is significantly below projected sales volumes, and is not making any profit to cover the $1,300,000 investment. For such reasons the court is satisfied that plaintiffs also have demonstrated that the threatened injury to them outweighs whatever damage the proposed injunction may cause the opposing party. Indeed, the entry of a preliminary injunction only will require Murphy to comply with Alabama law.

### 4. Injunction Will Serve the Public Interest

26

The purpose and intent of the AMFMA is "to encourage fair and honest competition, and to safeguard the public against creation of monopolies or unfair methods of competition, in transactions involving the sale of, or offer to sell, or inducement to sell motor fuel in the wholesale and retail trades in this state." Alabama Code § 8-22-3. As United States District Judge Wm. Bevard Hand observed in another case based on the same Act, "Alabama has an interest in preventing unfair and dishonest competition, monopolies and price wars. The [AMFMA] protects those interests and thereby protects both independent retailers, and the general consuming public." *State of Alabama ex rel. Galanos v. Star Service & Petroleum Co.*, 616 F. Supp. 429, 431 (S.D. Ala. 1985) (internal citation omitted). For example, when a retail gasoline dealer launches a "price war" by selling gasoline below its costs in a particular market area, the losses sustained by the belligerent generally are covered, or "subsidized" by profits earned at other locations.[20] Evidence presented at the last hearing

---

[20] Alabama Code § 8-2-2(2) defines several ways in which "price war" losses may be subsidized by profits earned in other operations:

> Unfair competition in the marketing of motor fuel occurs whenever costs associated with the marketing of motor fuel are recovered from other operations, allowing the refined motor fuel to be sold at subsidized prices. Such subsidies most commonly occur in one of three ways: when refiners use profits from refining of crude oil to cover below normal or negative returns earned from motor fuel marketing operations; where a marketer with more than one location uses profits from one location to cover losses from below-cost

27

(plaintiffs' exhibit 7) suggests that Murphy may have subsidized the price of gasoline sold at its South Memorial Parkway retail outlet with profits from its Highway 20 station, which was offering regular unleaded gasoline to the general public for 1.25 a gallon on November 22, 1999: i.e., 21 cents more than the 1.04 per gallon price at the former location.  While below cost prices are favored by the consuming public during the competitive conflict, the salutary economic benefits may be temporary.   The Alabama Legislature found that "[s]ubsidized pricing is inherently predatory and is reducing competition in the petroleum industry, and if it continues unabated, will ultimately threaten the consuming public."   Alabama Code § 8-22-2(4).

### III. CONCLUSION

This court accordingly finds that plaintiffs' motion for preliminary injunctive relief is due to be granted.   An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this **3rd** day of January, 2000.

---

selling of motor fuel at another location; and where a business uses profits from nonmotor fuel sales to cover losses from below-cost selling of motor fuel.

The Alabama Supreme Court has noted yet a fourth example of illegal subsidization:   "[A] retailer cannot pool the costs of the various grades of gasoline and thereby sell one grade below the individual cost of that grade." *Galanos*, 519 So. 2d at 1285 n.5 (*citing with approval* Star Service & Petroleum Co. v. Star ex rel. Galanos, 518 So. 2d 126 (Ala.Civ.App. 1986)).

28

United States District Judge

29