UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

**FILED**
01 MAY -7 PM 2: 54
U.S. DISTRICT COURT
N.D. OF ALABAMA

CAMPBELL & SONS OIL COMPANY, )
INC., THRASHER OIL COMPANY, )
INC., and TOMCO, INC., )
    )
    Plaintiffs, )
    )
vs. )        Civil Action No. CV-99-S-3176-NE
    )
MURPHY OIL USA, INC., )
    )
    Defendant. )

**ENTERED**
MAY 7 2001

## MEMORANDUM OPINION

Plaintiffs sell petroleum products at wholesale and retail within the State of Alabama. Defendant is a vertically integrated producer of petroleum products. Plaintiffs allege the defendant sold regular, unleaded gasoline in Huntsville, Alabama, at a retail price that was below defendant's costs, in violation of the Alabama Motor Fuel Marketing Act of 1984, Alabama Code § 8-22-1 *et seq.* (1975). Section 8-22-6 of that Act provides, in relevant part, that "[i]t shall be unlawful for any person engaged in commerce in this state to sell or offer to sell motor fuel below cost ... where the effect is to injure competition."

This court entered a temporary restraining order on December 15, 1999, and a preliminary injunction on January 3, 2000.[1] The action now is before the court on plaintiffs' application for final

---

[1]*See* Ala.Code § 8-22-17(a), providing:

    (a) Any person injured by any violation, or who would suffer injury from any threatened violation, of this chapter may maintain an action in any court of equity jurisdiction to prevent, restrain, or enjoin such violation or threatened violation. If in such action a violation or threatened violation of the chapter shall be established, the court shall enjoin and restrain, or otherwise prohibit, such violation or threatened violation and, in addition thereto, the court shall assess in favor of the plaintiff and against the defendant the costs of suit, including reasonable attorney's fees. In such action it shall not be necessary that actual damages to the plaintiff be alleged or proved, but where alleged or proved, the plaintiff in said action, in addition to such injunctive relief and cost of suit, including reasonable attorney's fees, shall be entitled to recover from the defendant the damages sustained by him.



injunctive relief, and, six motions to impose sanctions for defendant's alleged violations of the preliminary injunction. Upon consideration of the evidence presented in all hearings,[2] the court enters the following opinion.

## I. JURISDICTION

There is complete diversity of citizenship,[3] and the value of the injunctive relief sought by plaintiffs exceeds $75,000.[4] This court accordingly has jurisdiction of the controversy pursuant to 28 U.S.C. § 1332(a)(1).

## II. THE DEFENDANT AND ITS HUNTSVILLE STATION

Murphy Oil USA, Inc. ("Murphy") conducts business from its headquarters in El Dorado, Arkansas. The company explores for oil in various parts of the United States and the world. It operates two oil refineries, more than ten distribution terminals, 250 retail outlets in at least fifteen states, and, employs more than one thousand persons. Murphy's gross revenues during 1998 exceeded one billion dollars.[5]

Murphy entered into a supply and operations agreement with Wal-Mart on November 12, 1998. The contract provided for Murphy to lease sites at Wal-Mart "SuperCenter" stores in the

---

[2]Evidence in support of plaintiffs' application for temporary restraining order was heard on December 7 and 8, 1999. A hearing on plaintiffs' application for preliminary injunctive relief was held on December 27, 1999. The final hearing was conducted on March 19, 20, 23, and 26 – 28, 2001.

[3]Plaintiffs are Alabama corporations. They conduct business principally within that State, but also service some retail gasoline stations in southern Tennessee. Defendant is an Arkansas corporation headquartered in that State.

[4]This action originally was filed in the Circuit Court for Madison County, Alabama, but was removed to this court by defendant on December 1, 1999, pursuant to 28 U.S.C. §§ 1332, 1441, 1446. Plaintiffs moved to remand (doc. no. 5), asserting this court lacked subject matter jurisdiction because the amount in controversy did not exceed $75,000. The court received evidence on that issue on December 7, 1999, and determined that the value to plaintiffs of the rights sought to be enforced by injunction was greater than the jurisdictional threshold. *See, e.g.*, Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 347, 97 S.Ct. 2434, 2443, 53 L.Ed.2d 383 (1977) ("In actions seeking declaratory or injunctive relief, ... the amount in controversy is measured by the value of the object of the litigation."); Ericsson GE Mobile Communications v. Motorola Communications & Electronics, Inc., 120 F.3d 216, 218 (11th Cir. 1997) (same); Occidental Chemical Corp. v. Bullard, 995 F.2d 1046, 1047 (11th Cir. 1993) (same).

[5]*See* Plaintiffs' Exhibit 16, at 18-19, 25, 27.

States of Alabama, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, and Virginia, upon which Murphy would construct and operate retail gasoline stations. With regard to pricing, the agreement provides, in pertinent part, that

> Lessee [Murphy] agrees to price its fuel products to be competitive with other branded, unbranded or independent gasoline marketers that are priced lowest in each Station's retail market or trade area. Lessor and Lessee understand that it is the goal of the parties that in the event a Gift Card Discount is offered at a Station pursuant to Article 26 of this Agreement, the Wal-Mart Gift Card Customers will be able to purchase gasoline at a price that is lower than other competitive branded, unbranded or independent gasoline marketers that are priced lowest in each Station's retail market or trade area. Lessor and Lessee agree that in some markets it is unlawful to market gasoline below cost and that Lessee will not be required to price its gasoline in an unlawful manner to meet competitors' prices.

(Plaintiffs' Exhibit 36, ¶ 6.3(b).) Pursuant to the terms of that agreement, Murphy constructed a retail gasoline facility on the parking lot of a Wal-Mart "SuperCenter" situated on the west side of South Memorial Parkway in Huntsville, Alabama. Wal-Mart's property is bordered on the north by Redstone Road, on the east by South Memorial Parkway, and on the south by Hobbs Road. The Murphy station is situated in the northeast corner of Wal-Mart's parking lot, and it consists of four double-sided pumps[6] monitored by an attendant housed in an 84 square foot kiosk.[7]

Before beginning construction of the south Huntsville station, which opened on July 31, 1999, Murphy projected the net cost of doing business at that location as $0.068 (*i.e.*, 6.8 cents) a gallon, based on a "target volume" of 175,000 gallons a month.[8] The station sold 134,947 gallons

---

[6]In other words, a total of eight vehicles can simultaneously pump gasoline from the four pumps.

[7]Murphy operates a similar retail gasoline facility on the parking lot of the Wal-Mart SuperCenter in Madison, Alabama, but that station was not implicated by the evidence presented in this action.

[8]The 6.8 cent per gallon "projected" cost of doing business is based upon two sources: the testimony of Murphy's Vice President of Retail Marketing, Hank Heithaus, during the TRO hearing; and, the stipulation of the parties. This court observes, however, that while the pro forma projection may have been this amount, Murphy's Pricing Manager from August 1999 to January 1, 2001, James David Ridings, testified at final hearing that Murphy's "general guideline" for the cost of doing business at stations within Alabama was 7 cents a gallon. That rule of thumb established by Ridings's superior, Hank Heithaus. More importantly, however, Murphy's *actual* costs of doing business at the south Huntsville station exceeded even that amount, as will be noted hereafter.

of gasoline during its first month of operation, August of 1999; 135,710 gallons the following month; 176,786 gallons in October; 219,984 gallons in November; 199,099 gallons in December; and, 115,781 gallons in January of 2000. These gross gallonages obscure several facts worthy of comment.

For one, Murphy's station met its "target volume" projection in only the third month of operation. That is remarkable, in view of the testimony by Murphy's Vice President of Retail Marketing, Hank Heithaus, that it could take as long as six months for a new station to develop a mature customer base, especially one selling unbranded gasoline and offering no services or merchandise beyond cigarettes.[9]  That goal was gained so quickly, at least in part, because of the "Wal-Mart Gift Card" discount program.[10]  If a consumer presented a "Wal-Mart Gift Card" to the cashier at Murphy's station during its first month of operation, the retail pump price of any grade of

---

[9]These sales volumes are even more remarkable when one considers that the Murphy station cannot be directly reached from the principal north-south traffic artery in Huntsville, South Memorial Parkway, but must be accessed either through the Wal-Mart parking lot (which does front on the Parkway) or *via* a side street intersecting the Parkway.

[10]Pursuant to the agreement between Wal-Mart and Murphy, the following applies:

26.1    Gift Card Discount

a. Lessor [Wal-Mart] and Lessee [Murphy] agree to offer a discount to Station customers who use a gift card issued by Lessor (the "Gift Card") at certain Stations selected by Lessor. In the event Lessor's customer purchases a Gift Card in Lessor's store for a designated amount, the Gift Card may be used to purchase gasoline (but no other products or services unless hereafter specifically agreed to in writing by Lessor and Lessee) at Lessee's station for a discounted price. *Lessee agrees to contribute a 3 cent discount per gallon of gasoline sold under the Gift Card.* Lessor agrees to contribute any discount over the 3 cent discount, the amount thereof to be determined solely by Lessor from time to time. Lessor's goal is to support the level of discount necessary for the Cross Promotion to be mutually satisfactory.

...
26.2    Gift Card Sales
...

c. *In the event the Gift Card discount offered under* this program would cause Lessee to offer a price to the public that is below the level permitted by applicable law, the price shall be lowered only to the level *permitted by applicable law.* Lessee will provide written monthly reports to Lessor which track Lessee's costs at each particular station operating under this program.

Plaintiffs' Exhibit 36, ¶¶ 26.1(a), 26.2(c) (emphasis supplied)

gasoline was immediately discounted 5 cents a gallon. During the second and subsequent months of operation, the retail pump price of any grade of gasoline was discounted 3 cents a gallon. Approximately 25% of sales at the Murphy station were to holders of a Wal-Mart Gift Card during the ten month period the discount program was in effect.[11]

Undoubtedly the most important fact stimulating Murphy's attainment of its "target volume" in less than normal time, however, was this: its south Huntsville station consistently sold regular, unleaded gasoline below Murphy's costs. For example, plaintiffs' exhibit 55 depicts Murphy's price, comparative market survey, and "pool margin"[12] data for the period covering August 23, 1999 through February 18, 2000. Of the 72 days for which data is provided, from August 23 through December 15, 1999 (the date on which this court entered a temporary restraining order), Murphy's records reflect that its Gift Card prices for regular, unleaded gasoline were below its costs on 68 of those 72 days (*i.e.*, the recorded margin was less than 6.8 cents a gallon), and, that its Gift Card price "beat" competition on 52 of those 68 days.[13] Thus, according to Murphy's own market survey data (which this court has previously found, and continues to find, not credible), Murphy was selling below its costs. Furthermore, it was not doing so for the purpose of meeting competition, at least with regard to its Gift Card price. Finally, Murphy did not cease its practice of selling below its costs until this court entered a temporary restraining order.

Another very significant fact is that Murphy's south Huntsville station registered its highest sales volumes during the months of November and December 1999,[14] time frames that are central

---

[11]July 31, 1999 through May 23, 2000.

[12]The "pool margin" is the margin for all grades of gasoline (*i.e.*, regular unleaded, plus, and premium).

[13]It should be noted that these numbers are based on the "pool margin," rather than the margin for regular, unleaded gasoline, data for which was not provided.

[14]Significantly, Murphy's expert noted in his revised report dated September 15, 2000 that "November is known to be a month of lower sales volume." Plaintiffs' Exhibit 39, ¶ 37.

to the injunctive relief sought by plaintiffs.

### III. THE PLAINTIFFS

Campbell & Sons Oil Company, Inc. ("Campbell"), is among the largest branded gasoline distributors in the State of Alabama.[15]  It markets Chevron, Conoco,[16] and Texaco[17] petroleum products at both the wholesale and retail levels of distribution, and sells an unbranded gasoline ("Liberty 2000") at retail.[18] One of Campbell's Conoco-branded stations (store # 123) is located just north of Redstone Road, on the west side of South Memorial Parkway, approximately one-half mile north of Murphy's station.

On the date this court first heard evidence in connection with plaintiffs' application for a temporary restraining order, Thrasher Oil Company, Inc. ("Thrasher") — which sells Shell-branded petroleum products at wholesale — and Tomco, Inc. ("Tomco") — a retail distributor of Shell-branded gasoline — were "related" entities, in that all stock in both corporations was owned by the same persons, the four daughters of Tom Thrasher.  On February 27, 2001, however, all Thrasher stock was acquired by the Spencer Companies, Inc., which markets Amoco-branded petroleum products at wholesale and retail in the Huntsville, Alabama market, and Citgo-branded products at the same levels of distribution in the Birmingham, Alabama market. The stock of Tomco continues to be owned by the four daughters of Tom Thrasher.  Thrasher sells Shell-branded products at

---

[15]Campbell acquired all stock of Stephens Oil Co., Inc., the wholesale and retail distributor for Chevron petroleum products in the Huntsville, Madison County, Alabama market, on November 8, 1999.  On the date of that acquisition, the combined companies (Campbell & Sons Oil Co., Inc., Campbell Brothers Oil Co., Inc., and Stephens Oil Co., Inc.) became the second largest branded gasoline distributor in Alabama.  Since then, however, the combined companies have slipped to "probably the top five or six" distributors, according to Alan Campbell, Secretary of the closely-held, family-owned corporations.

[16]Campbell sells Conoco-branded petroleum products at retail through 15 company owned stations in North Alabama.

[17]Campbell serves 84 Texaco stations:  55 of those are company owned and sell Texaco-branded products at retail; the remainder are independent dealers to whom Campbell sells at wholesale.

[18]Campbell owns and operates 9 such unbranded stations.

wholesale to Tomco, which resells to the public at retail through 27 convenience store gasoline stations. Tomco owns and operates two such stations on South Memorial Parkway in Huntsville. One ("Shell # 6") is located at the intersection of Weatherly Road with South Memorial Parkway, north of Murphy's station. The other ("Shell # 27") is located at the intersection of Hobbs Road with the Parkway, no more than one-third of a mile south of Murphy's station. The evidence has focused on the latter station.

## IV. STANDARD FOR PERMANENT INJUNCTIVE RELIEF

The standard for issuance of a permanent injunction is essentially the same as that for a preliminary injunction, except that a plaintiff seeking permanent injunctive relief must show actual success on the merits, rather than a mere likelihood of success on the merits. *See Amoco Production Co. v. Village of Gambell, AK,* 480 U.S. 531, 546 n.12, 107 S.Ct. 1396, 1404 n.12, 94 L.Ed.2d 542 (1987) (citing *University of Texas v. Camenisch,* 451 U.S. 390, 392, 101 S.Ct. 1830, 1832, 68 L.Ed.2d 175 (1981)). Plaintiffs therefore must establish: (1) defendant's violation of the applicable statutory authority; (2) continuing irreparable injury to plaintiffs in the absence of injunctive relief; and (3) lack of an adequate remedy at law. *See Newman v. State of Alabama,* 683 F.2d 1312, 1319 (11th Cir. 1982).

## V. THE ALABAMA MOTOR FUEL MARKETING ACT

The Supreme Court of Alabama has held that §§ 8-22-3, 8-22-6, and 8-22-9 of the Alabama Motor Fuel Marketing Act ("AMFMA" or "the Act") must be construed together. *See State ex rel. Galanos v. Mapco Petroleum, Inc.,* 519 So. 2d 1275, 1286 (Ala. 1987).[19] Section 8-22-3 contains

---

[19]The Alabama Supreme Court so held, because the act of reading each section "literally and in isolation might well lead to a conclusion that they are unreasonably overbroad or void for vagueness...." State ex rel. Galanos v. Mapco Petroleum, Inc., 519 So. 2d 1275, 1286 (Ala. 1987).

a declaration of legislative intent, and it reads as follows:

> It is hereby declared that marketing of motor fuel in Alabama is affected with the public interest. It is hereby declared to be the legislative intent to encourage fair and honest competition, and to safeguard the public against creation of monopolies or unfair methods of competition, in transactions involving the sale of, or offer to sell, or inducement to sell motor fuel in the wholesale and retail trades in this state. It is further declared that the advertising, offering for sale, or sale of motor fuel below cost or at a cost lower than charged other persons on the same marketing level with the intent of injuring competitors or substantially lessening competition is an unfair and deceptive trade practice. The policy of the state is to promote the general welfare through the prohibition of such sales. The purpose of the Motor Fuel Marketing Act is to carry out that policy in the public interest, providing for exceptions under stated circumstances, providing for enforcement and providing penalties.

Alabama Code § 8-22-3 (1975) (1993 Replacement Volume).  Section 8-22-6 prohibits certain

"below cost fuel sales":

> It shall be unlawful for any person engaged in commerce in this state to sell or offer to sell motor fuel below cost or to sell or offer to sell it at a price lower than the seller charges other persons on the same day and on the same level of distribution, within the same market area, where the effect is to injure competition.

*Id.* § 8-22-6.  Finally, section 8-22-9 provides that:

> It shall be unlawful under this section:
> (1) For any person engaged in commerce in this state to sell or offer to sell motor fuel at wholesale or retail, as the case may be, where the effect is to injure competition.
> (2) For any person, where the effect is to injure competition, to offer a rebate, to offer to give a rebate, to offer a concession of any kind in connection with the sale of motor fuel.
> (3) For any retailer to induce or attempt to induce or to procure or attempt to procure the purchase of motor fuel at a price less than cost to wholesaler. Any person who violates any provision of this section shall be subject to the provisions and penalties of this chapter.

*Id.* § 8-22-9.

The Act elsewhere defines the terms "sale or sell" as meaning "[a]ny transfer for a

combination, exchange, barter, gift, offer for sale, advertising for sale, soliciting an order for motor

fuel and distribution in any manner or by any means whatsoever." *Id.* § 8-22-4(7). Section 8-22-10 expands that definition by providing that

> [i]n all advertisements, offers for sale or sales involving two or more items, at least one of which items is motor fuel, at a combined price, and in all advertisements, offers of sale, or sales, involving the giving of any gift or concession of any kind whatsoever (whether it be coupons or otherwise), the wholesaler's or retailer's combined selling price shall not be below the cost to the wholesaler or the cost to the retailer, respectively, of the total of all articles, products, commodities, gifts, and concessions included in such transactions, except that if any such articles, products, commodities, gifts, or concessions, shall not be motor fuel, the basic cost thereof shall be determined in like manner as provided in subdivision (14) of Section 8-22-4.

*Id.* § 8-22-10. Sections 8-22-4(7) and 8-22-10 fold back upon § 8-22-9(2), set out above, which makes it unlawful for "any person"[20] to offer a "rebate" or "concession of any kind in the sale of motor fuel" when the "effect" of such practice "is to injure competition."

## A.    Elements of a Prima Facie Case

Reading the foregoing sections *in pari materia*, the Alabama Supreme Court held that a plaintiff establishes a prima facie case by showing, first, that a defendant sold motor fuel below its costs and, second, that such action had the effect of injuring competition. *Galanos*, 519 So. 2d at 1286 ("[T]he legislature has in explicit terms prohibited sales below cost where the effect is to injure competition."). It is not required that a plaintiff prove that a defendant *intended* to injure competition; rather, as Chief Justice Torbert observed in his special concurrence to the *Galanos* decision, "such an intent will be presumed upon a showing that the acts have the effect of injuring competition. The defendant can rebut that presumption by proving [as an affirmative defense] the lack of [a harmful] intent." *Galanos*, 519 So. 2d at 1289 (Torbert, C.J., concurring). Chief Justice Torbert's statement is but a gloss on the words of Justice Almon who, in speaking for seven

---

[20]"Person" is defined expansively, and includes "[a]ny person, firm, association, organization, partnership, business trust, joint stock company, company, corporation, or legal entity." Ala.Code § 8-22-4(1).

members of the *Galanos* Court, said:

> It may readily be seen [from reading sections 8-22-3, -6, and -9 *in pari materia*] that the legislature has in explicit terms prohibited only sales below cost where the effect is to injure competition. We think that to read the intent provision of § 8-22-3 into these provisions so as to place a burden on the [plaintiff] to prove intent would be manifestly contrary to the terms of the Act. However, we do think that the various provisions of the Act can be read together in a way that will save their constitutionality. It is quite consonant with the spirit and terms of the Act to construe it as providing that the [plaintiff] proves a prima facie case when it proves a sale below cost and an injurious effect on competition, and yet as allowing the defendant to prove lack of a harmful intent either in avoidance of liability or in mitigation of any penalty, as the trier of fact may determine.

*Galanos*, 519 So. 2d at 1286. Each element of liability and defense is discussed in the following subsections.

### 1.    Sales below cost

Murphy sold regular, unleaded gasoline below its costs from November 18 through 24, 1999. During that period, Murphy's "laid-in" cost of regular (87 octane) unleaded gasoline was $1.1529 a gallon.[21]

When Murphy's "cost of doing business"[22] at the south Huntsville station (which it asserted

---

[21]The President of Thrasher Oil testified that the "laid-in cost" of motor fuel is calculated by adding federal, state, and local taxes, freight costs, and inspection fees to the "rack price": *i.e.*, the amount paid for each gallon purchased at the Duncan Terminal near Birmingham, Alabama (*see* Plaintiffs' Exhibit 1: a copy of the Oil Price Information Service ("OPIS") listing for the period November 12-29, 1999). As thus defined, the trade idiom "laid-in cost" includes all variables delineated in the statutory term, "cost to retailer," except the retailer's "cost of doing business" discussed in the following textual paragraph and footnote. *See* Ala.Code § 8-22-4(16), reading as follows:

> (16) COST TO RETAILER. As applied to retail sales, the invoice or replacement cost of the motor fuel within five days prior to the date of sale, in the quantity last purchased, whichever is less, less all trade discounts except customary discounts for cash, to which shall be added all applicable state, federal and local taxes, inspection fees, freight cost, if paid by the retailer, *plus the cost of doing business*. [Emphasis supplied.]

[22]*See* Ala.Code § 8-22-4(17), defining the phrase, "cost of doing business or overhead expenses," as including

all costs incurred in the conduct of business, including but not limited to: labor (including salaries of executives and officials), rent (which rent must be no less than fair market value based on current use), interest on borrowed capital, depreciation, selling cost, maintenance of equipment, transportation or freight cost, losses due to breakage or damage; credit card fees, or other charges; credit losses, all types of licenses, taxes, insurance, and advertising.

at the TRO and preliminary injunction hearings amounted to 6.8 cents a gallon[23]) is added to its "laid-in cost,"[24] the total cost to Murphy for each gallon of regular, unleaded gasoline sold at that retail outlet was $1.2209. Despite Murphy's knowledge, gained from the testimony and arguments during the TRO and preliminary injunction hearings, that this was a crucial issue, no attempts were made by Murphy to calculate the actual cost of doing business at its south Huntsville station. In his deposition taken on November 9, 2000, almost a year after the preliminary injunction was issued, Hank Heithaus testified that he had not made any effort to determine whether the 6.8 cent per gallon cost of doing business used in the company's pro forma planning model correctly reflected the station's overhead expense, taking into account the categories set forth in the AMFMA. He further testified that even the planning model did not take into account one of the statutorily enumerated categories, *i.e.,* depreciation. Accordingly, Mr. Heithaus conceded that the estimate of 6.8 cent a gallon was "low."[25]

Additionally, when Murphy's Assistant Controller, Edward Berry, was subsequently deposed on December 5, 2000, plaintiffs presented him with figures allocating the actual costs between gasoline and "inside" (or merchandise) sales for the months of August 1999 through January 2000 at Murphy's south Huntsville station.[26] Mr. Berry conceded there were several different methods that could be used to allocate costs between gasoline and inside sales, but he had not made any such calculations for that station, and he could not offer an opinion as to which method was the most accurate.[27]

---

[23]See *supra* note 8 and related text.

[24]See *supra* note 21.

[25]*See* Plaintiffs' Exhibit 16, at 79-80, 96-99.

[26]*See* Plaintiffs' Exhibit 45. Calculations also were made for July 1999, but the station was open for business only one day during that month, July 31. The figures for July will not be considered in the following discussion.

[27]*Id.* at 33-34.

-11-

Using the same method Murphy employed when calculating the costs for its planning model,[28] but including depreciation, plaintiffs determined Murphy's cost of doing business at the south Huntsville station to be: 7.44 cents a gallon for August 1999; 10.90 cents for September 1999; 8.57 cents for October 1999; 8.76 cents for November 1999; 6.89 cents for December 1999; and 12.50 cents for January 2000.[29] Using a second method to allocate expenses between fuel and non-fuel sales, the merchandise margin was divided by the total margin. The total expenses were then allocated between merchandise and fuel based on the percentage obtained. Using this method, plaintiffs determined Murphy's cost of doing business at the south Huntsville station as: 7.2 cents a gallon for August 1999; 10.5 cents for September 1999; 7.9 cents for October 1999; 7.2 cents for December 1999; and 12.0 cents for January 2000.[30] Using yet a third method for allocating costs, plaintiffs divided fuel sales by total sales to obtain a percentage. Plaintiffs then determined the allocated merchandise expense and subtracted it from the total expenses to determine the allocated gasoline expense. The allocated gasoline expense was then divided by total gallons sold each month, from August 1999 through January 2000. Using this method, plaintiffs determined the cost of doing business to be: 7.7 cents a gallon for August 1999; 11.4 cents for September 1999; 9.0 cents for October 1999; 9.2 cents for November 1999; 7.9 cents for December 1999; and 13.5 cents for January 2000.[31] As noted above, at the time of Mr. Berry's deposition, Murphy presented no evidence to demonstrate that there was a more accurate method of calculating its actual cost of doing

---

[28]The planning model for Murphy's south Huntsville station included the following categories specified in the Act: labor, rent, maintenance of equipment, losses due to damage or breakage, credit card fees, all types of licenses, taxes, insurance, and advertising. It did not specifically include interest on borrowed capital, depreciation, selling costs, or credit losses. *See* Plaintiffs' Exhibit 16, at 100-05.

[29]*See* Plaintiffs' Exhibit 47.

[30]*See* Plaintiffs' Exhibit 49. The cost for November could not be calculated using this method, as there was a negative margin.

[31]*See* Plaintiffs' Exhibit 51.

business, or that the figures obtained by plaintiffs using three different methods of allocating expenses were incorrect.

Adopting the first method described above (Murphy's planning model method plus depreciation[32]), this court finds that Murphy's average cost of doing business at its south Huntsville station from August 1 through November 30, 1999 was 8.92 cents a gallon.[33] Even so, for purposes of this opinion, the 6.8 cents per gallon figure utilized for purposes of analysis in the memoranda of opinion accompanying this court's TRO and preliminary injunction will continue to be employed because, *at the very least*, that is the figure by which Murphy should have been guided for purposes of compliance with the preliminary injunction.[34] Furthermore, with respect to November 1999, Murphy sold below its costs, even assuming the cost of doing business was as low as 6.8 cents a gallon.

During the period in question — which significantly commenced on the same date that Tomco opened its new, Shell-branded gasoline station and convenience store just south of Murphy's station — Murphy sold regular, unleaded gasoline to the general public for $1.04[9] a gallon. If a consumer presented a "Wal-Mart Gift Card" to the cashier, then the pump price was discounted an additional three cents for each gallon purchased, yielding a net price to the Wal-Mart/Murphy customer of $1.01[9] a gallon. In either event, on November 18, 1999, Murphy was selling regular, unleaded gasoline to the general public for 17.29 cents a gallon less[35] (and to Wal-Mart Gift Card

---

[32]See *supra* note 25 and related text.

[33]7.44¢ (Aug. 1999) + 10.90¢ (Sept. 1999) + 8.57¢ (Oct. 1999) + 8.76¢ (Nov. 1999) = 35.67¢ ÷ 4 = 8.9175¢ average.

[34]See *infra* section VI, addressing plaintiffs' motions to hold Murphy in contempt.

[35]*I.e.*, $1.1529 a gallon "laid-in cost" + 0.069¢ a gallon cost of doing business = 1.2219 a gallon cost - 1.049 per gallon pump price = 0.1729¢ less than Murphy's costs.

holders for 20.29 cents a gallon less[36]) than its costs.[37]

## 2.   Injurious effect on competition

Plaintiffs assert that they lost profits and failed to achieve target sales volumes due to Murphy's below-cost pricing. Murphy, through its expert witness, John Siegfried, Ph. D., contends that there is no evidence to "convincingly relate[]" the injury allegedly suffered by plaintiffs to Murphy's below cost pricing in November 1999.[38]  Murphy further contends that "[i]n order to establish causation between Murphy's pricing and the lower margins plaintiffs may have experienced in November, 1999, it is essential to control for the effect of other market phenomena on margins, including the rising price of refined gasoline."[39]  None of the courts addressing the AMFMA have directly confronted the issue of causation.[40]

The Act provides that it is unlawful to sell motor fuel below cost "where the effect is to injure competition."  Alabama Code § 8-22-6.  Such language implies that there must be a cause to generate the effect:  *i.e.*, the defendant's below cost pricing must have caused the injurious effect. *See McGuire Oil v. Mapco, Inc.*, 958 F.2d 1552, 1562 n.15 (11th Cir. 1992) ("The requirement that a plaintiff must have been injured as a result of a defendant's violations of the AMFMA functions as a kind of antitrust injury requirement, and 'ensures that the harm claimed by the plaintiff

---

[36]17.29¢ + 3¢ Gift Card discount = 20.29¢ less than Murphy's costs.

[37]The parties have stipulated that Murphy's margins for regular, unleaded gasoline were negative numbers: that is, -10.05 cents a gallon on November 18th, -8.6 cents on November 19th through November 21st, -10.6 cents on November 22nd, -3.6 cents on November 23rd, and -1.05 cents on November 24, 1999.  The parties have further stipulated that Murphy's negative margins for the Gift Card discount sales were even greater.  Additionally, these stipulated amounts do not take into account the cost of doing business.

[38]Plaintiffs' Exhibit 39, ¶ 35.

[39]*Id.* ¶ 38.

[40]In Star Service & Petroleum Co., Inc. v. State of Alabama ex rel. Galanos, 518 So. 2d 126, 128 (Ala. Civ. App. 1986), the court found the testimony of the defendant's competitors that they were injured by its below cost pricing of gasoline sufficient to support a finding that the defendant had injured competition.

corresponds to the rationale for finding a violation of the antitrust laws in the first place.'") (quoting *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 354, 110 S.Ct. 1884, 1900, 109 L.Ed.2d 333 (1990)).

The Eleventh Circuit has addressed causation in the context of federal antitrust law, stating "[t]he causation question asks not whether the antitrust violation caused the plaintiff's injury, but whether the banned effects flowing from that violation — as opposed to the beneficial ones — led to plaintiff's harm." *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1427 (11th Cir. 1990). The *Minolta* case primarily involved a claim of "secondary-line" price discrimination under § 2(a) of the Robinson-Patman Act. The Eleventh Circuit, after acknowledging the "raging" controversy over the meaning of the word "competition" as applied to § 2(a) and reviewing a long line of precedent, concluded that "the legal focus of the competitive injury inquiry is on the competitor, not the consumer." *Id.* at 1418 n.6. As this is the same inquiry mandated by the Alabama Supreme Court in cases involving the AMFMA, the Eleventh Circuit's holding with regard to causation is instructive. This court finds that it is not necessary for plaintiffs to establish that their injury was *solely* due to Murphy's below cost pricing practices; rather, it is sufficient that they establish they were injured, and that their injury flows from Murphy's violation of the AMFMA.[41]

Alan Campbell, Secretary and co-owner with his brother of Campbell Oil Company, testified that, prior to the opening of Murphy's south Huntsville station, his company's nearest Conoco-

---

[41]It should be further noted that Murphy's expert witness, Dr. Siegfried, testified at final hearing that he disagrees with the AMFMA's definition of competition set forth at Ala.Code § 8-22-4(13), and with the Alabama Supreme Court's holding, interpreting that section, in McGuire Oil Co. v. Mapco, Inc., 612 So. 2d 417, 422 (Ala. 1992), that "injury to a competitor suffices to establish a violation of the AMFMA." Notwithstanding, as the Eleventh Circuit noted in Alan's of Atlanta v. Minolta Corp., 903 F.2d 1414, 1418 n.6 (11th Cir. 1990), "[f]or the time being we are satisfied merely to make it clear that when confronted with contemporary economic argument on the one hand and judicial precedent on the other, we feel, unlike those of a more activist bent, that economic argument is not ultimately controlling; judicial precedent is." (Citation omitted.)  This court is similarly persuaded.

branded station sold 60,000 to 65,000 gallons of gasoline each month. The volume for each month after Murphy entered the market was significantly less: 40,000 gallons in the months of August and September; 29,000 gallons in October; and 41,000 gallons in November of 1999. Moreover, the "mix" of grades sold changed. Before Murphy entered the market, Campbell's gross monthly sales volume was divided 50% regular unleaded, 25% mid-grade, and 25% premium grade gasoline. In contrast, during the four months following the opening of Murphy's Huntsville station, Campbell's sales were divided 75% regular unleaded, 15% mid-grade, and only 10% premium grade gasoline. Campbell's Conoco station lost $6,191 in November 1999, and $3,765 in December 1999. Campbell considered closing the station, but opted to pursue this litigation as a means of avoiding that course.

Although Tomco's retail losses are more difficult to quantify, due to the fact that its new Shell-branded station opened on November 18, 1999, only a few weeks before the temporary restraining order was issued, the President of Thrasher testified that Tomco's gasoline sales at that outlet were significantly less than his market projections. On November 18, 1999, the day the station opened, Tomco sold 708 gallons,[42] whereas the Murphy station located just a short distance north sold approximately 7,713 total gallons. The following day Tomco's station sold approximately 1,464 gallons, while Murphy sold 10,410. During Tomco's grand opening week, its sales never exceeded 1,600 gallons in any one day.[43]

---

[42]*See* Defendant's Exhibit 86. These figures have been rounded to the nearest gallon.

[43]When discussing volumes sold by the parties, the court is not basing its decision on the simplistic fact that Murphy's station attracted more customers during the period in question than did plaintiffs' retail outlets. Rather, the court is utilizing those numbers as a rough measurement of the injurious effect of Murphy's illegal pricing practices on two competitors. As such, the finding is not contrary to the holding in Star Service & Petroleum Co., Inc. v. State, 518 So. 2d 126 (Ala.Civ.App. 1986):

We agree with Star that it is part of the normal competitive process for competitors to be "injured" when they lose customers to a marketer who offers the public a lower price. Such "injury"

While there may be other factors which contributed to Campbell's losses and Tomco's failure to achieve targeted sales volumes at its new Shell station, the most striking influence unquestionably is Murphy's below-cost pricing practices. Murphy's expert witness suggested that other, more likely reasons for the plaintiffs' losses were the increase in the rack price of gasoline and the reallocation of sales among competitors following Tomco's entry in the market. Both of these explanations are unconvincing. For example, Campbell's Conoco station #121, located on University Drive in Huntsville, is not in the same market area as Murphy's south Huntsville station. That station suffered a decrease in gross profit on fuel sales from October to November 1999, which could indeed be attributable to a rise in rack and wholesale prices of gasoline.[44] However, Campbell's Conoco station #123, located less than one-half mile from the Murphy station, suffered a decrease in gross profit from fuel sales from $6,451 in July 1999 to a low of $1,611 in October 1999, and had $1,629 in gross profit on fuel sales in November 1999.[45] In December 1999, when the temporary restraining order was entered, the gross profit on fuel sales at Conoco station #123 increased to $4,432. If the November losses were indeed attributable to higher wholesale gasoline prices, it seems likely that there would have been a more significant difference in gross profits between October and November (when gross profits for store #123 actually increased $18.00).

---

is not what the [A]MFMA addresses. Rather, it is injury to competition (which necessarily includes injury to competitors) *due to certain unlawful sales tactics, such as selling motor fuel below cost, as in this case.*

*Id.* at 130 (emphasis supplied). Moreover, the finding is not contrary to the recent decision of the Alabama Supreme Court in *Young Oil Co. v. Racetrac Petroleum, Inc.*, 757 So. 2d 380, 386 (Ala. 1999), holding that "the AMFMA does not penalize petroleum marketers ... for an increase in market share (and concomitantly, a loss of market share by its competitors) resulting from a more efficient operation," because Murphy has failed to demonstrate that its contested retail price of 1.04 a gallon (much less the 1.01 a gallon price offered to Wal-Mart Gift Card holders) included any consideration of Murphy's "cost of doing business or overhead expenses" at the Wal-Mart SuperCenter station on South Memorial Parkway.

[44]*See* Plaintiffs' Exhibit 104.

[45]*See* Plaintiffs' Exhibit 103.

In light of the foregoing, this court finds that plaintiffs have established that their injuries flowed from Murphy's practice of below-cost pricing and, thus, a prima facie case.

**B.      Lack of Injurious Intent**

Defendant has failed to rebut the presumption of an intent to injure competition arising upon plaintiffs' proof of a prima facie case.

As the Alabama Supreme Court observed, the State Legislature "provided several exceptions [to the AMFMA] that may be characterized as [affirmative] defenses of 'no injurious intent.'" *Galanos*, 519 So. 2d at 1286.   Murphy has relied upon the statutory exception of "meeting competition."

> It is not a violation of this chapter if any price is established in good faith to meet an equally low price of a competitor in the same market area on the same level of distribution selling the same or a similar product of like grade and quality or is exempt under Section 8-22-13.

Alabama Code § 8-22-8(b); *see also id.* §§ 8-22-12, 8-22-13(a).   In support of that defense, Murphy's Manager of Pricing and Non-Fuel Programs during November of 1999, David Ridings, testified that he personally determined the price for each grade of motor fuel sold at the company's Huntsville station in reliance upon comparative market price surveys compiled Monday through Friday (and sometimes on a Saturday or Sunday) of each week by the station manager.   The surveys were transmitted each morning by facsimile to Murphy's corporate headquarters in Arkansas, where they were reviewed.   Daily decisions about the price to be charged for each grade of gasoline sold at the Huntsville station for the remainder of that day, or beginning the following morning, were handwritten on the bottom of the same faxed survey form and re-transmitted to the station manager.[46] This court rejects that evidence for three independent reasons.

---

[46]*See* Defendant's Exhibit 1.

First, the court does not find Murphy's comparative market price surveys for the period focused upon, November 18th through the 24th, to be credible. Counsel for plaintiffs demonstrated several inconsistences between the information recorded in those forms and other evidence. For example, the surveys list two stations that allegedly sold regular, unleaded gasoline as low as Murphy during the period in question: the "Williams Service" station in Gasoline Alley, and the "Mojo's Deli" station on South Parkway, both of which were recorded as selling that grade for $1.04 a gallon continuously from November *12th* through the 23rd. Williams Petroleum Company owned and operated the "Williams Service" station referred to,[47] and it also sells unbranded gasoline at retail through an agreement with the owner of "Mojo's Deli." The records of Williams Petroleum show that the price for regular, unleaded gasoline was not lowered to $1.04 a gallon at either outlet until November *19th.*[48] In doing so, the company sold below its costs, but did so for the purpose of meeting the competition posed by Murphy's posted price. Moreover, *no* stations listed on Murphy's survey charged $1.01 a gallon, which was the discount price available to customers who used a Wal-Mart Gift Card.

In this regard, Murphy contends that the AMFMA is inapplicable to its discount price, in that the Act is silent as to whether its proscriptions against below cost pricing apply to discounts. Alternatively, Murphy argues that the price discount for Wal-Mart Gift Card customers was implemented as a good faith response to credit card programs, such as the ones available to Shell, Conoco, and BP customers; and the car wash discounts available to customers of competitors such

---

[47]Charles Williams, President of Williams Petroleum Company, testified that the dealer at the Gasoline Alley station changed brands last year, and is now a "Gas Plus" station. Williams Petroleum Company no longer has a station in Gasoline Alley.

[48]Additionally, Murphy's surveys for November 22nd through November 29th conflict with the records of Williams Petroleum of the prices charged at the Mojo's station on Memorial Parkway.

as Tomco (Shell) and USA Mini-Mart. Testimony at the final hearing established, however, that the purchase rebates are offered by the issuers of credit cards (*i.e.*, banks), and that such rebates affect neither the pump price paid by the credit card holder, nor the compensation received by the retail gasoline distributor. Murphy's discount program was clearly different than the rebate or car wash discount programs offered by its competitors. Murphy offered a discount of three cents (and, at first, as much as five cents) a gallon off the pump price of all grades of gasoline, and advertised the discount alongside its posted price on the station's canopy. Furthermore, Murphy's contract with Wal-Mart specifically provided that, "[i]n the event the Gift Card discount offered under this program would cause [Murphy] to offer a price to the public that is below the level permitted by applicable law, the price shall be lowered only to the level *permitted by applicable law*."[49] This provision clearly indicates that Murphy was required to set both its regular and Gift Card prices in accordance with state below-cost pricing statutes, such as the AMFMA.

Second, Murphy's Huntsville manager allegedly surveyed the prices posted by competitors located "*on* Memorial Parkway" three to four miles north, and five to six miles south, of defendant's station. The southern leg of that loop, however, carried the manager over the Tennessee River bridge, into Morgan County, Alabama. Not only is that stretch of road no longer "Memorial Parkway" (rather, it then is U.S. Highway 231), but it enters an area that traditionally has been referred to as "Gasoline Alley," because of the numerous branded and unbranded stations clustered there. The area is not located within the limits of any incorporated town or municipality, and Morgan County does not levy a gasoline tax. It follows, therefore, that each station in Gasoline Alley can sell any grade of motor fuel for four cents a gallon less than any dealer located in

---

[49]Plaintiffs' Exhibit 36 (emphasis supplied).

Huntsville (which levies a one cent per gallon tax) and Madison County, Alabama (which exacts a three cent per gallon tax). Even so, not one of such stations listed on Murphy's comparative market price surveys[50] sold regular, unleaded gasoline for as little as $1.04 a gallon during the period this opinion has focused upon. Thus, even if such stations were deemed to be within "the same market area,"[51] and this court finds that they are not,[52] they still provide no justification for Murphy's challenged pricing practices.

Finally, this court finds that Murphy knowingly lowered its price for regular, unleaded gasoline to $1.04 a gallon for the general public (and to $1.01 a gallon for holders of Wal-Mart Gift Cards) on the eve or morning of the opening of Tomco's new Shell station, and that it did so with the intent of solidifying its competitive position in relation to that station, offering far more pumps and amenities in its "convenience store" format than Murphy's simple four pump "kiosk." *See Galanos*, 519 So. 2d at 1286 (discussing the "destructive practice of developing clientele and diminishing competitors' business while temporarily suffering a loss in anticipation of higher profits after competitors have been driven out of business"). While David Ridings testified that he was unaware that Tomco's new station had opened until November 22, when it first appeared on a price

---

[50]"Gasoline Alley" comparators are identified on each sheet of Defendant's Exhibit 1 by the initials "GA." The Williams Service and the Spur stations listed on the survey were also located in Gasoline Alley. See *supra* note 47.

[51]*See* Richard A. Posner, Economic Analysis of Law 282 (3d ed. 1986) (noting the tendency of courts when defining market areas "to include in the market those sellers who actually sell to the same group of customers and exclude those who do not"). *Cf.* United States v. Engelhard Corp., 126 F.3d 1302, 1305 (11th Cir. 1997) ("The boundaries of the product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product and substitutes for it.").

[52]Murphy was offered the opportunity to demonstrate that the stations in Gasoline Alley were within its relevant market area, but failed to do so. The testimony adduced at trial has persuaded this court that the relevant market area for the Murphy station on Memorial Parkway is a one to one-and-one-half mile radius, which does not include the stations in Gasoline Alley. While unbranded stations, such as Murphy, typically offer lower gasoline prices than branded stations, such as those operated by the plaintiffs, there are several unbranded competitors within the relevant market area. As such, there is no justification for Murphy to consider the stations in Gasoline Alley when making pricing decisions. Notwithstanding, as noted *supra*, none of the Gasoline Alley comparators listed on Murphy's price surveys *actually* sold regular, unleaded gasoline for as little as $1.04 a gallon during the relevant period. *Compare, e.g.*, Defendant's Exhibit 1 *with* Defendant's Exhibit 137.

survey, Murphy's on-site station manager and assistant manager were certainly aware of the imminent opening of the Shell station. All of Murphy's representatives who were responsible for making pricing decisions testified that they relied exclusively upon the information provided by the station managers, and they had systems in place to collect and act on that information. As such, Murphy is charged with the knowledge that Tomco was opening a competing gas station virtually next door. As a consequence, Murphy cannot claim the benefits of the "meeting competition" affirmative defense.

> We do not agree with the defendant's interpretation that meeting competition means beating competition. Section 8-22-8 is clear and unambiguous. The statute cannot be read so as to allow one defendant-competitor to undercut another plaintiff-competitor's prices and then contend that by doing so it is meeting competition. Section 8-22-8 should not be used offensively to ensure that a defendant's price of gasoline will always be below its competition. Therefore, the meeting competition defense is not available to a defendant that knowingly sets its prices below those of its competitor.

*McGuire Oil Company v. Mapco, Inc.*, 612 So. 2d 417, 423-24 (Ala. 1992); *see also Young Oil Company v. Racetrac Petroleum, Inc.*, 757 So. 2d 380, 386 (Ala. 1999) (holding that "a retailer's intent [should] be measured at the time the retailer acts").

## C.   Irreparable Harm and Inadequate Remedy at Law

The focus at this stage of analysis is on the harm that may occur if a permanent injunction is not issued, and the availability of any adequate legal remedy.

> Whereas the essential finding that must be made to issue a TRO or preliminary injunction is irreparable injury, the essential prerequisite to a permanent injunction is the unavailability of an adequate remedy at law. Irreparable injury is, however, one basis, and probably the major one, for showing the inadequacy of any legal remedy. Often times the concepts of "irreparable injury" and "no adequate remedy at law" are indistinguishable. [One court] acknowledged the frequent indistinguishability but went on to say: "The irreparable injury rubric is intended to describe the quality or severity of the harm necessary to trigger equitable intervention. In contrast, the

-22-

inadequate remedy test looks to the possibilities of alternative modes of relief, however serious the initial injury.

*Lewis v. S.S. Baune*, 534 F.2d 1115, 1123 (5th Cir. 1976) (citations omitted).[53]

Plaintiffs have established that Murphy's pricing practices during November 1999 resulted in a significant loss of revenues by competitors within the same market area.   Campbell contemplated the closure of its Conoco station.  During November 1999, Tomco's new station was significantly below projected sales volumes, and did not make any profit to cover the company's $1,300,000 investment in the new facility.  For such reasons, the court is satisfied that plaintiffs have demonstrated there is no adequate remedy at law.

## D.   The Public Interest

The public interest is served by the entry of a permanent injunction.  The purpose and intent of the AMFMA is "to encourage fair and honest competition, and to safeguard the public against creation of monopolies or unfair methods of competition, in transactions involving the sale of, or offer to sell, or inducement to sell motor fuel in the wholesale and retail trades in this state."[54] Alabama Code § 8-22-3.  As United States District Judge Brevard Hand observed in another case based on the same Act, "Alabama has an interest in preventing unfair and dishonest competition, monopolies and price wars.  The [AMFMA] protects those interests and thereby protects both independent retailers, and the general consuming public."  *State of Alabama ex rel. Galanos v. Star Service & Petroleum Co.*, 616 F. Supp. 429, 431 (S.D. Ala. 1985) (internal citation omitted).

---

[53]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)(*en banc)*, the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[54]Another purpose of state "fair competition" acts is "to afford smaller, less powerful competitors an effective remedy for below cost selling and other unfair acts." Samuel L. Perkins, Charles F. Phillips & Geoffrey B. Schwartz, *A Place for Fair Competition Acts in Motor Fuel Marketing*, 26 N. Ky. L. Rev. 211, 260 (1999).

**E.     Civil Penalty**

The provisions of the AMFMA relating to penalties for violation of the Act read as follows:

> (a) Any person who violates this chapter shall be subject to a civil penalty not to exceed ten thousand dollars ($10,000) per violation for each offense. Any such person shall also be liable for attorney fees and shall be subject to injunctive relief. Each day that a violation of this chapter occurs shall be considered as a separate violation.

> (b) The penalty may be assessed and recovered in a civil action brought by the Attorney General, or by any district attorney in any court of competent jurisdiction. If brought by a district attorney, 30 percent of the penalty shall be paid to the office of the district attorney which brought the action and 70 percent of the penalty shall be paid to the treasury of the county in which the judgment was entered. If brought by the Attorney General, one-half of the penalty shall be paid to the treasury of the county where the action was brought and one-half shall be paid to the State Treasury.

Alabama Code § 8-22-16. Of course, this action was brought by private plaintiffs, rather than the Attorney General or a local district attorney; accordingly, subsection (a) applies.[55]

The court finds that Murphy violated the AMFMA from November 18 through 24, 1999, and assesses a civil penalty of $5,000 a day for each of those days, or a total of $35,000. Additionally, Murphy shall be required to pay reasonable attorneys' fees and costs to plaintiffs.

## VI. PLAINTIFFS' CONTEMPT MOTIONS

Plaintiffs have filed six motions to hold Murphy in contempt of the preliminary injunction order and for sanctions. In a civil contempt proceeding, proof of the defendant's violations must be

---

[55]At first reading, it might appear that a civil penalty can be assessed only in actions brought by the Attorney General of Alabama or a local district attorney. The reader must note well, however, that subsection (a) of § 8-22-16 refers to "attorney fees," in addition to the civil penalty. By contrast, subsection (b) provides for apportionment of the payment of the civil penalty between the office of the district attorney and the treasury of the county where the action was brought, or between the treasury of the county where the action was brought and the State Treasury. Clearly, attorney fees cannot be assessed for actions brought by a district attorney or the Attorney General, and the apportionment in subsection (b) is intended to compensate the office of the district attorney or the Attorney General for time and effort expended by its attorneys in bringing the action. Accordingly, a person who violates the Act is subject to a civil penalty, regardless of whether the action is brought by private plaintiffs or by one of the State's attorneys.

clear and convincing. *United States v. Rizzo,* 539 F.2d 458, 465 (5th Cir. 1976). A simple preponderance of the evidence will not suffice. Even so, the violation need not be willful for a party to be held in civil contempt. *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 197, 69 S.Ct. 497, 502, 93 L.Ed. 599 (1949). Once a party has been found to be in civil contempt, a court may impose appropriate sanctions. 11A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice and Procedure* § 2960 (2d ed. 1995).

## A.    Motion to Hold Defendant in Contempt and for Sanctions

The first motion to hold defendant in contempt of the preliminary injunction order and for sanctions was filed by plaintiffs on March 6, 2000.[56] Plaintiffs allege that, from February 21 – 25, 2000, Murphy sold regular, unleaded gasoline at prices that were below its costs as defined in the Act and preliminary injunction. Plaintiffs further allege that the prices were not set to "meet" competition within defendant's market area. Plaintiffs submitted the following in support of the motion: the affidavit of Alan Campbell; photographs of Murphy's posted prices for February 21 through 25, 2000; the Oil Price Information Service ("OPIS") reports for the relevant time period; Murphy's price surveys; and photographs of the prices posted at the USA Mini-Mart, Fuel City, Mojo's, and MPG gasoline stations for the relevant dates. On February 21, 2000, Murphy's costs total $1.3455 a gallon, but its posted pump price was $1.32 a gallon, and its Gift Card price was $1.29 a gallon.[57] From February 22 through 25, 2000, Murphy's costs totaled $1.3410 a gallon, but its posted pump price was $1.32 a gallon,[58] and its Gift Card price was $1.29 a gallon.[59] Thus,

---

[56]Doc. no. 47.

[57]According to Murphy's records, Gift Card sales accounted for 30.2% of total gallons sold.

[58]At some point on February 25, 2000, Murphy raised its street price to $1.38 a gallon, and its Gift Card price to $1.35 a gallon.

[59]Gift Card sales accounted for 33.2% of total gallons sold on February 22, 2000; 31.7% of total gallons sold on February 23, 2000; and 27.1% of total gallons sold on February 24, 2000.

Murphy sold regular, unleaded gasoline below its costs during this entire period.

Murphy's handwritten and computerized surveys for February 21 and 22 represent that the competitors with the lowest price for regular, unleaded gasoline were Mojo's and Fuel City at $1.*29* a gallon. Photographs taken on those dates, however, reflect that both stations had priced regular, unleaded gasoline at $1.*32* a gallon. Murphy's handwritten survey for February 23 represents that the posted price for regular, unleaded gasoline at Mojo's and Fuel City was $1.*29* a gallon; however, the computerized survey, reflecting the prices "phoned in" by the station manager,[60] recorded Fuel City's price as $1.33 a gallon and Mojo's price as $1.32 a gallon. Plaintiffs' photographs confirm the accuracy of the latter information, reflecting that Fuel City's and Mojo's prices indeed were $1.33 and $1.32 a gallon, respectively. Murphy's handwritten survey for February 24, 2000 reflects that the competitor with the lowest price was Mojo's at $1.39 a gallon. Myra Flippo, Murphy's station manager in February 2000, testified that she sent a fax to David Ridings, Manager of Pricing and Non-Fuel Programs, at Murphy's home office on February 24, 2000, with the notation "[d]o our gas prices need to go [up] I thought we had to be 3¢ above the lowest in our area. We are currently 3¢ below. I'm concerned. (Please note) Phone entries are currently correct." Carl James, Assistant Manager of Pricing and Non-Fuel Programs for Murphy, testified that on February 24, 2000, he made the decision to increase the price to $1.35,[61] and that Hank Heithaus, Murphy's Vice President of Retail Marketing, wrote "135/142/150" on the computerized survey to be faxed back to the station manager. There is no evidence that the fax was transmitted to, or received by the station, however.

---

[60]David Ridings testified that in early 2000, a new computerized system was developed by Murphy's Information Systems Department, at his request, which permitted station managers to enter the price survey information by telephone, using the telephone keypad. Mr. Ridings testified that the "lawsuit" stores, including the Murphy station on Memorial Parkway, were required to fax the handwritten surveys in addition to entering the information by telephone.

[61]David Ridings would normally have made the decision, but he was not in the office. Carl James was the Assistant Pricing Manager at the time, and made the decision, with Hank Heithaus' concurrence, in Mr. Ridings' absence.

On February 25, 2000, Murphy's price remained at $1.32, and the lowest price charged by a competitor (USA Mini-Mart) was $1.35. On that date, the notation "go to 138/145/152, 2/25" was made on the computerized survey. Myra Flippo testified that she received the directive from Mr. Ridings on February 25, 2000, to increase the price for regular, unleaded gasoline to $1.38 a gallon.

This court finds that Murphy violated the preliminary injunction from February 21 through 25, 2000, with respect to its Gift Card price. Plaintiffs have convincingly demonstrated that Murphy's survey information was incorrect from February 21 through 23, 2000. Murphy clearly was on notice by the issuance of the preliminary injunction that the accuracy of its surveys was in doubt. David Ridings, who made the pricing decisions at that time, testified that he had read the court's order, including the portion finding that the comparative market surveys were not credible. Even so, neither he nor any other responsible Murphy official took any steps, other than allegedly emphasizing to its station managers the importance of exact price information, to ensure that its competitive market surveys were correct. On February 24, 2000, Murphy did not take steps to ensure that the price increase to $1.35 was communicated to the station manager and implemented, even in light of the station manager's expressed concern that Murphy's price was three cents below its competitors. The price was not increased until sometime on February 25th, after the handwritten and phone-in surveys were received and reviewed by Mr. Ridings.

**B.    Second Motion to Hold Defendant in Contempt**

Plaintiffs filed an amended motion to hold defendant in contempt on June 15, 2000.[62] Plaintiffs allege that, in May 2000, defendant placed on the top of its gas pumps a printed "Customer Alert" stating that "Murphy USA has been ordered to discontinue the use of the Wal-Mart Gift Card

---

[62]Doc. no. 63.

-27-

discount at [its] pumps." The "Customer Alert" also stated that the discount would be suspended as of May 23, 2000. In support of the motion, plaintiffs submitted the affidavit of Alan Campbell and a copy of the "Customer Alert." Plaintiffs contend that the statements made by defendant in the "Customer Alert" were "clearly and deliberately false," that they were "intended to create distrust and to destroy confidence of the people in the Court," and that the statements were "intended to intimidate [plaintiffs] into discontinuing their current suit and to prejudice the administration of justice." Murphy alleges it had requested that this language be omitted from the so-called pump-topper, but the independent public relations firm hired to produce the printed material failed to make the changes. Notwithstanding this asserted "mistake," this court finds that Murphy knowingly, deliberately, and intentionally misrepresented the order of this court and, in so doing, harmed plaintiffs.

## C.     Third Motion to Hold Defendant in Contempt

Plaintiffs filed a third motion to hold Murphy in contempt on July 3, 2000.[63] They allege that Murphy sold regular, unleaded gasoline below its costs in violation of the AMFMA and preliminary injunction on June 23, 2000. In support of the motion, plaintiffs submitted the affidavit of Larry Daugette, a sales representative for Campbell. Murphy's total costs for regular, unleaded gasoline were $1.4895 a gallon on June 23, 2000, but its posted pump prices were $1.45 a gallon initially, and $1.44 a gallon later in the day.[64] Thus, Murphy sold regular, unleaded gasoline below its costs on June 23, 2000.[65]

David Ridings testified during the final hearing that he had relied upon competitive market

---

[63]Doc. no. 70 (incorrectly entitled "second amended motion").

[64]The price decrease to $1.44 a gallon was communicated to the station manager by fax at 12:41 p.m.

[65]Murphy had discontinued the gift card discount by this date.

price surveys compiled by the manager of Murphy's south Huntsville station when setting the price at $1.45 a gallon. While the price surveys indicated that MPG's price for regular, unleaded gasoline was $1.44, and that Fuel City's price was $1.45 a gallon on June 23rd, Jerry "Buzzy" Byrom (who, with his father, owns and operates Byrom Oil Co., including the Fuel City station on Memorial Parkway) testified that Fuel City's price in fact was $1.47 a gallon from June 20-28, 2000. Larry Daugette testified that, on June 23, 2000, the unbranded stations were at least one cent higher than Murphy, and that Murphy's posted pump price was $1.45 on the morning of June 23rd, and that it was lowered to $1.44 a gallon in the afternoon. Although Myra Flippo, who was Murphy's station manager at the time, testified that she had accurately recorded competitor prices, her survey's accuracy was called into question by the testimony of two witnesses. This court accordingly finds that Murphy violated the preliminary injunction on June 23, 2000, when it initially set its price for regular, unleaded gasoline at $1.45 a gallon (3.95 cents below its costs), and later lowered it to $1.44 a gallon (4.95 cents below costs).

### D.    Fourth Motion to Hold Defendant in Contempt

Plaintiffs filed a fourth motion to hold Murphy in contempt on September 19, 2000.[66] Plaintiffs contend that, on August 24, September 11, and September 12, 2000, defendant sold regular, unleaded gasoline below its costs in violation of the Act and preliminary injunction. Plaintiffs further contend that the "meeting competition" defense is not available to defendant, as no other retailer in the relevant market area posted prices as low as Murphy's. In support of the motion, plaintiffs submitted: the affidavit of Larry Daugette; photographs of the posted prices of Murphy, USA Mini-Mart, Fuel City, MoJo's, and MPG; and OPIS reports for the relevant dates.

---

[66]Doc. no. 79.

Murphy's total costs for regular, unleaded gasoline were $1.37 a gallon, $1.447 a gallon, and $1.4645 a gallon, on August 24, September 11, and September 12, respectively. Murphy's posted pump price for regular, unleaded gasoline on August 24th initially was $1.36 a gallon (one cent below its costs), and that price was not increased to a level above Murphy's costs ($1.39 a gallon) until 4:47 p.m.

On September 11, 2000, Murphy's posted pump price initially was $1.39 a gallon (5.7 cents below its costs), and that negative pricing point was further decreased to $1.36 a gallon (8.7 cents below costs) at 8:54 a.m.

On September 12, 2000, Murphy's posted pump price initially was $1.36 a gallon (10.45 cents below its costs). Even though that price was increased to $1.39 a gallon at 2:33 p.m., that still was 7.45 cents below Murphy's costs.

Thus, Murphy sold gasoline below its cost on each of the dates asserted by plaintiffs in their fourth motion.

In attempted justification, Murphy noted that its computerized price survey for August 24, 2000 contains the notation, "5 day replacement: 6.8¢ plus margin all grades." The notation was made by David Ridings, and the form was initialed by Carl James. Mr. Ridings testified that he believed that he could set the price at $1.36 a gallon, because the "pool margin" for all grades (regular unleaded, plus, and premium)[67] exceeded the court-specified 6.8 cent per gallon cost of doing business. However, the preliminary injunction states that Murphy is enjoined "from selling any grade of motor fuel to the general public or holders of a 'Wal-Mart Gift Card' at defendant's station located at 11610 Memorial Parkway Southwest in Huntsville, Alabama, ... at a retail price

---

[67]The "pool margin," or margin for all grades, was .0896. The margin for regular, unleaded gasoline was .0587.

per gallon that is less than defendant's cost of such motor fuel as defined in the Alabama Motor Fuel Marketing Act." Such language clearly required Murphy to add a 6.8 cent "cost of doing business" factor to its other costs related to *each* grade of gasoline sold at the south Huntsville station, and not for all grades of gasoline combined.  In *Star Service & Petroleum Co. v. State of Alabama ex rel. Galanos*, 518 So.2d 126, 128 (Ala. Civ. App. 1986), the Alabama Court of Civil Appeals ruled that a retailer cannot pool the profit margins on sales of different grades of gasoline and thereby sell any grade below its individual cost. *See also State of Alabama ex rel. Galanos v. Marco Petroleum, Inc.*, 519 So. 2d 1275, 1285 n.5 (Ala. 1987).  This court accordingly finds that Murphy violated the preliminary injunction on August 24, 2000.

The handwritten and computerized surveys transmitted to Murphy's headquarters by the south Huntsville station manager during the morning hours of September 11, 2000 reflect that MPG's posted price for regular, unleaded gasoline was $1.36 a gallon.  Murphy's station manager apparently sent a "second survey" to Murphy's home office later on the day of September 11th, however, this time representing that MPG's price had been raised to $1.39 a gallon.[68]  Photographs taken by plaintiffs on that date reflect that MPG's posted pump price indeed was $1.39 a gallon. Even so, Larry Daugette, who made the photographs, testified that the photographs were taken around mid-day or in the early afternoon.  Thus, it is possible that MPG's price at the time Murphy took its first survey (between 5:00 and 5:30 a.m.) was $1.36 a gallon, and that it was not increased to $1.39 a gallon until later that morning.  Accordingly, this court finds that Murphy did not violate the preliminary injunction on September 11, 2000, as it appears more likely than not that its price was the same as MPG's, at least at the time of Murphy's initial market survey.  Moreover, since

---

[68]Mr. Ridings testified that the copy of the "second survey," admitted as part of defendant's exhibit 6, came from the station, and that he had neither a record nor a recollection of receiving it.

Murphy lowered its price to $1.36 a gallon at 8:54 a.m. on September 11, 2000, the defense of meeting competition in good faith is available.

On September 12, 2000, Murphy had both the lowest price and a negative pool margin.[69] Murphy also had been advised on September 11, presumably prior to 2:00 p.m. (the time the station manager, Nadja Clark, finished her work day), that MPG's price for regular, unleaded gasoline had increased to $1.39 a gallon. This price was also reflected in Ms. Clark's handwritten survey for September 12, 2000, which was required to be faxed to the home office prior to 8:00 a.m. However, Murphy's price was not increased until 2:33 p.m. Thus, this court finds that Murphy violated the preliminary injunction on September 12, 2000.

**E.     Fifth Motion to Hold Defendant in Contempt**

Plaintiffs filed a fifth motion to hold Murphy in contempt on December 1, 2000.[70] They allege that, on November 13, 2000, defendant sold regular, unleaded gasoline for a price that was below its costs, in violation of the AMFMA and preliminary injunction. Plaintiffs submitted: the affidavit of Larry Daugette; photographs of the posted prices of the defendant, USA Mini-Mart, Fuel City, MoJo's, and MPG on November 13, 2000; and the OPIS prices for the relevant time period. Murphy's total costs for regular, unleaded gasoline was $1.378 a gallon on November 13, 2000. Murphy's posted pump price was $1.39 a gallon (1.2 cents above its costs) until 12:11 p.m., when it was decreased to $1.36 (1.8 cents below its costs). According to Murphy's records, its price remained at $1.36 a gallon until at least November 15, 2000. Thus, beginning at 12:11 p.m. on November 13, 2000, Murphy sold regular, unleaded gasoline below its costs.

According to Murphy's handwritten and computerized surveys, the competitors with the

---

[69]The individual margins for the various grades of gasoline are not reflected on the computerized survey.
[70]Doc. no. 88.

lowest prices were MPG and Mojo's at $1.39 a gallon. All three stations surveyed in Gasoline Alley were lower than $1.39.[71] Murphy's margin for regular, unleaded gasoline, as noted on its computerized survey, was .0610, not including the $.068 cost of doing business, and the "pool margin" was .0824. Nonetheless, Murphy lowered its price to $1.36 a gallon. As noted above, the relevant margin for purposes of determining compliance with the injunction was that for regular, unleaded gasoline. Because the margin for that grade was less than 6.8 cents, Murphy violated the injunction on November 13, 2000.

**F.     Sixth Motion to Hold Defendant in Contempt**

Plaintiffs filed a sixth motion to hold Murphy in contempt on January 10, 2001.[72] They contend that, on January 4 and 5, 2001, defendant sold regular, unleaded gasoline at prices that were below its costs, in violation of the AMFMA and preliminary injunction. Plaintiffs submitted: the affidavit of Larry Daugette; photographs of the posted prices for January 4 and 5, 2001, of defendant, MoJo's, MPG, Fuel City, and USA Mini-Mart; and the OPIS prices for the relevant time period. On January 4 and 5, 2001, Murphy's total costs for regular, unleaded gasoline were $1.32 a gallon. On January 4, 2001, Murphy's posted pump price for regular, unleaded gasoline was $1.30 a gallon (two cents below its costs), and that price was decreased an additional twelve cents (to $1.18 a gallon) at 10:53 a.m. On the morning of January 5, 2001, Murphy's posted price for regular, unleaded gasoline was $1.189 a gallon; even though that price was increased to $1.24 a gallon at noon, Murphy still was eight cents below its costs.

Murphy's handwritten and computerized price surveys reflect that the competitor with the

---

[71]Spur's price was $1.37 a gallon, Pure's price was $1.37 a gallon, and Williams Service's price  was $1.36 a gallon.

[72]Doc. no. 98.

-33-

lowest posted price on January 4, 2001 was USA Mini-Mart, which had priced its regular, unleaded

gasoline at $1.24 a gallon. Williams Service, which was located in Gasoline Alley,[73] and therefore

was not within Murphy's relevant market area, had priced its regular, unleaded gasoline at $1.18 a

gallon. Carl James, the Assistant Pricing Manager, directed the station manager to reduce the price

to $1.18 a gallon, and the change was implemented at 10:53 a.m. Mr. James testified that he

"quickly glanced" at the survey and saw that Williams Service's price was $1.18 a gallon. Despite

the fact that Williams Service was located in Gasoline Alley, Mr. James directed the decrease in

price to match that station's price. The price was increased to $1.24 a gallon, the same price charged

by USA Mini-Mart, at 12:00 noon on January 5, 2001. This court finds that Murphy violated the

preliminary injunction on January 4, 2001, when it reduced the price to $1.18 a gallon, until January

5, 2001, when it increased the price to $1.24 a gallon.

## G.    Sanctions

Sanctions for civil contempt serve the purposes of either coercing the contemnor into

compliance, or compensating the complainant for damages resulting from past non-compliance, or

both. *See, e.g., International Union, United Mine Workers of America v. Bagwell,* 512 U.S. 821,

829, 114 S.Ct. 2552, 2558, 129 L.Ed.2d 642 (1994); *In re E.I. DuPont de Nemours & Co. — Benlate

Litigation,* 99 F.3d 363, 367 (11th Cir. 1996), *cert. denied,* 522 U.S. 906, 118 S.Ct. 263, 139 L.Ed.2d

190 (1997). Here, the court finds that both purposes will be served by imposing sanctions

(including reasonable attorneys' fees) for Murphy's non-compliance with the preliminary injunction.

As detailed above, this court finds that Murphy violated the Act and preliminary injunction

on numerous occasions, subjecting it to the civil penalty provisions of Alabama Code § 8-22-16(a).[74]

---

[73]See *supra* note 47.

[74]See *supra* note 35.

Civil penalties will be assessed as follows:  $6,000 a day for February 21 through 25, 2000; $7,000 for June 23, 2000; $8,000 a day for August 24 and September 12, 2000; $9,000 for November 13, 2000; and, $10,000 a day for January 4 and 5, 2001.  The civil penalties assessed, including the penalties for violations of the Act in November 1999, total $117,000.

## VII. CONCLUSION

This court accordingly finds that plaintiffs' motion for permanent injunctive relief is due to be granted, and that its motions for contempt are due to be granted in part and denied in part.  An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this 7th day of May, 2001.

United States District Judge

-35-